**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

South Carolina Department of
Disabilities and Special Needs;
South Carolina State Budget and
Control Board and Control
Board-Insurance Reserve Fund,
    *Plaintiffs-Appellees,*

v.

Hoover Universal, Incorporated,
    *Defendant-Appellant.*

No. 07-1190

South Carolina Department of
Mental Health; South Carolina
State Budget and Control
Board and Control Board-
Insurance Reserve Fund,
    *Plaintiffs-Appellees,*

v.

Hoover Universal, Incorporated,
    *Defendant-Appellant.*

No. 07-1202

Appeals from the United States District Court
for the District of South Carolina, at Greenville.
Joseph F. Anderson, Jr., Chief District Judge.
(6:04-cv-01219-JFA; 3:03-cv-04118-JFA)

Argued: May 15, 2008

Decided: July 30, 2008

Before NIEMEYER and DUNCAN, Circuit Judges,
and Claude M. HILTON, Senior United States District Judge for
the Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Duncan and Senior Judge Hilton joined.

---

## COUNSEL

**ARGUED:** Richard K. Wray, REED SMITH, LLP, Chicago, Illinois,
for Appellant. Andrew Frederick Lindemann, DAVIDSON, MORRI-
SON & LINDEMANN, PA, Columbia, South Carolina, for Appel-
lees. **ON BRIEF:** Casey L. Westover, REED SMITH, LLP, Chicago,
Illinois; William Toal, George C. Johnson, JOHNSON, TOAL &
BATTISTE, PA, Columbia, South Carolina, for Appellant.

---

## OPINION

NIEMEYER, Circuit Judge:

The South Carolina Department of Mental Health, the South Caro-
lina Department of Disabilities and Special Needs, and the South Car-
olina State Budget and Control Board-Insurance Reserve Fund
commenced these product liability actions against Hoover Universal,
Inc., invoking diversity jurisdiction and alleging damages resulting
from Hoover's sale to the plaintiffs of defective trusses and sheathing,
which were incorporated into public buildings constructed in the
1970s. Relying mainly on South Carolina's statute of repose and stat-
utes of limitations, the district court entered summary judgments in
favor of Hoover.

While appeals were pending in this court, the plaintiffs filed a
motion to vacate the judgments in the district court under Federal
Rule of Civil Procedure 60(b), asserting that under 28 U.S.C.
§ 1332(a)(1), they were not "citizens" for diversity purposes and

therefore the district court never had subject matter jurisdiction. After we granted a limited remand for consideration of the jurisdiction issue, the district court granted the plaintiffs' motion. We now affirm, albeit reluctantly in view of the plaintiffs' original invocation of diversity jurisdiction and their late recognition of the lack of subject matter jurisdiction.

I

The South Carolina Department of Mental Health and the South Carolina Department of Disabilities and Special Needs constructed 23 buildings during the 1970s, using roof trusses and sheathing treated with a fire-retardant chemical sold by the predecessor of Hoover Universal, Inc., a Michigan corporation. After the roof of a building unexpectedly collapsed, a survey was conducted in 2001 of all state-insured buildings using the trusses. From the survey, these Departments discovered that the trusses and sheathing used in their buildings were suffering from delamination and deterioration, allegedly caused by the fire-retardant chemical, and the wood therefore was losing structural strength. Experts also explained that the roof framing systems that included the trusses would become worse and therefore needed replacement. As a result, these Departments had to replace the roofing and roof framing systems, incurring costs and damages exceeding seven million dollars.

The large majority of the losses were initially paid by the Office of the Insurance Reserve Fund, a division of the South Carolina State Budget and Control Board, which insured the property of both the Department of Mental Health and the Department of Disabilities and Special Needs. The two Departments, as well as the Budget and Control Board-Insurance Reserve Fund, as subrogee, then commenced these two actions against Hoover in federal court under South Carolina statutory and common law, invoking diversity jurisdiction conferred by 28 U.S.C. § 1332(a)(1).

On Hoover's motions for summary judgment, the district court dismissed the actions, concluding they were barred mainly by South Carolina's statute of repose and various statutes of limitations. From these judgments, entered on March 8, 2006, the plaintiffs appealed.

While the appeals were pending, the plaintiffs filed a motion in the district court to vacate the judgments for lack of subject matter jurisdiction. Even though it was the plaintiffs who had commenced these actions in federal court by invoking diversity jurisdiction, they now argued for the first time that "as arms of the state of South Carolina, the Plaintiffs [were] not 'citizens' for purposes of diversity jurisdiction," as required by 28 U.S.C. § 1332(a)(1). Following the procedure outlined in *Fobian v. Storage Technology Corp.*, 164 F.3d 887, 891 (4th Cir. 1999), the district court entered an order notifying the parties that it was inclined to grant the motion to vacate the judgments, and we remanded the cases for the limited purpose of having the district court consider the motion.

The district court granted the motion to vacate both judgments, finding that the plaintiffs were alter egos of the State of South Carolina and therefore were not "citizens" for purposes of diversity jurisdiction. From the district court's judgments dated February 21, 2007, dismissing the cases for lack of subject matter jurisdiction, Hoover appealed, contending that the district court erred in concluding that the plaintiffs were alter egos of the State, because the plaintiffs, although created by state law, functioned sufficiently independently of the State to be considered "citizens" for diversity purposes.

II

An undoubtedly inequitable hardship results from allowing the plaintiffs to prosecute actions in federal court and, after they lose on motions for summary judgment, granting their motions to vacate the judgments because of a lack of subject matter jurisdiction. As Hoover laments, "Plaintiffs have presented the federal courts with a procedural morass of their own making, and should not be rewarded at this late stage of the proceedings with a 'do over' in state court." In most situations, this argument would be persuasive. But subject matter jurisdiction goes to the very power of the court to act, and regardless of the waste resulting from having completed proceedings later vacated by a late-discovered jurisdictional defect, an order or judgment entered by a court without subject matter jurisdiction is a nullity.

In these cases, the plaintiffs invoked diversity jurisdiction under 28 U.S.C. § 1332(a)(1), which confers jurisdiction on a federal court

over actions between "citizens of different States" where the amount in controversy exceeds $75,000. To satisfy the diversity requirement, the plaintiffs alleged (by implication) that Hoover was a citizen of Michigan and that the plaintiffs were citizens of South Carolina. The complaint actually alleged, "the parties are diverse; therefore, jurisdiction in this Court is appropriate."

It is well established that for purposes of diversity jurisdiction, a State is not a "citizen." *See Moor v. County of Alameda*, 411 U.S. 693, 717 (1973). Moreover, a public entity created under state law, which is "the arm or alter ego of the State," is likewise not a citizen for purposes of diversity jurisdiction. *Id.* (internal quotation marks omitted) (emphasis omitted); *see also Maryland Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005). But an entity created by the State which functions independently of the State with authority to sue and be sued, such as an independent authority or a political subdivision of the State, can be a "citizen" for purposes of diversity jurisdiction. *Moor*, 411 U.S. at 717-18; *Maryland Stadium Auth.*, 407 F.3d at 260.

The line separating a State-created entity functioning independently of the State from a State-created entity functioning as an arm of the State or its alter ego is determined by the particular legal and factual circumstances of the entity itself. To define that line, we have articulated a nonexclusive list of four factors to be considered: (1) whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State; (2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions; (3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and (4) how the entity is treated under state law, such as whether the entity's relationship with "the State [is] sufficiently close to make the entity an arm of the State." *See Maryland Stadium Auth.*, 407 F.3d at 261-62 (alteration in original) (drawing factors from *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391 (1979) and *Ram Ditta v. Maryland Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456 (4th Cir. 1987), and

quoting *Cash v. Granville County Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)).

Hoover contends that neither the Budget and Control Board-Insurance Reserve Fund nor the two Departments are alter egos of South Carolina. It asserts:

> The IRF [Budget and Control Board-Insurance Reserve Fund] is a proprietary insurance operation that funds itself through the sale of insurance to, and the collection of premiums from, its insureds — property owners that include both state and local governmental entities. Similar to any other insurance company, any subrogation recovery by the IRF in this case would be retained by the IRF in a trust fund. In analogous cases involving state-created trust funds, this Court and others have found that the entity in question is not the alter ego of the state, and therefore is a citizen for diversity purposes.

While Hoover acknowledges that the question with respect to the two state Departments is "closer," it makes a bifurcated argument as to them. It contends first that it should have been allowed discovery by the district court to enable it to determine whether, in fact, the two state Departments are alter egos of the State. Alternatively, it maintains that even if the two Departments are alter egos of the State, the district court should have exercised its authority

> to sever [the Budget and Control Board-Insurance Reserve Fund's] claims against Hoover Universal by dismissing [the Department of Mental Health] and [the Department of Disabilities and Special Needs] from the lawsuits. This procedure, according to the United States Supreme Court, protects considerations of finality, efficiency and economy, and is the best solution to the procedural quagmire that Plaintiffs have created.

The plaintiffs contend that they are created as and function as arms of the State of South Carolina and therefore are not citizens for purposes of diversity jurisdiction. They rely on the district court's analysis in this case, applying the four-factor test outlined in *Maryland*

*Stadium Authority*. Alternatively, they contend that Hoover's suggestion that the case be severed cannot be accommodated because all three agencies are indispensable parties.

A

We begin by considering the status of the Budget and Control Board-Insurance Reserve Fund.

The Budget and Control Board, which is comprised of the Governor, the State Treasurer, the Comptroller General, the Chairman of the Senate Finance Committee, and the Chairman of the Ways and Means Committee of the House of Representatives, *see* S.C. Code Ann. § 1-11-10, "is an executive body dealing primarily with the fiscal affairs of the State government" and "[is] a vital part of the machinery of the government of [South Carolina]," *State ex rel. McLeod v. Edwards*, 236 S.E.2d 406-07, 409 (S.C. 1977). Through the Board's Office of Insurance Services, the Board "is authorized to provide insurance for the State, its departments, agencies, institutions, commissions, boards, and the personnel employed by the State in its departments, agencies, institutions, commissions, and boards so as to protect the State against tort liability and to protect these personnel against tort liability arising in the course of their employment." S.C. Code Ann. § 1-11-140(A). Through its Office of Insurance Services, the Board is also authorized to provide insurance on public buildings and their contents. *Id.* § 1-11-140(F).

South Carolina requires that "[a]ll insurance on public buildings and on the contents thereof of the State and of all institutions supported in whole or in part by the State shall be carried by the State Budget and Control Board." S.C. Code Ann. § 10-7-10. The Board is required to charge premiums not greater than that which "would be charged by reliable old line insurance companies for carrying this insurance." *Id.* § 10-7-90. The premiums paid by state agencies to the Board are required to be held by the Board in a separate account designated as insurance reserve funds: "All funds paid over to the State Budget and Control Board as premiums on policies of insurance . . . provided for herein, shall be held by the Board as insurance reserve funds for the purpose of paying all losses for which it is liable and the expenses necessary to the proper conduct of such insurance of

public property by the Board and shall be invested by it as are other funds in its hands." *Id.* § 10-7-130.

The insurance reserve funds set aside to pay losses with respect to public buildings are subject to examination by the Director of the South Carolina Department of Insurance "to determine whether the funds are being administered in accordance with sound insurance practices and in the best interest of the State." S.C. Code Ann. § 38-13-190(2).

Thus, the "Insurance Reserve Fund" is not an entity, but rather an account that holds funds designated to pay losses under insurance issued by the Budget and Control Board. That account, however, is administered separately by an office of the Budget and Control Board referred to by the Board as the "Office of the Insurance Reserve Fund." That Office describes itself as functioning as:

> a governmental insurance operation with the mission to pro-
> vide insurance specifically designed to meet the needs of
> governmental entities at the lowest possible cost. The Insur-
> ance Reserve Fund operates like an insurance company, by
> issuing policies, collecting premiums (based on actuarially
> calculated rates), and paying claims from the accumulated
> premiums in accordance with the terms and conditions of
> the insurance policies it has issued.

To determine whether that Office, which is a division of the Budget and Control Board, functions as an arm or alter ego of the State, we apply the four *Maryland Stadium Authority* factors.

With regard to the first factor — whether any recovery by the plaintiffs will inure to the benefit of the State — Hoover claims that the circumstances weigh in favor of finding the Office's autonomy and independence from the State. Hoover directs our attention to South Carolina Code § 10-7-130, which states that "all money received . . . from any other source connected with the insurance of public property . . . shall be held by the Board as insurance reserve funds," arguing that any recovery by the Board in this case would stay in the insurance funds of the Board and would not be paid to the State's treasury. The argument, however, celebrates form over sub-

stance and fails to address the broader question of whether the recovery retained by the Board as part of the insurance reserve funds would "inure to the benefit of the state." *Maryland Stadium Auth.*, 407 F.3d at 262. The broader inquiry does not focus on whether funds are retained in a particular account of the State or in the general fund of the State treasury, but rather whether recovery here would inure *to the benefit* of the State. When so considered, we conclude that any recovery here would in fact inure to the benefit of South Carolina.

The Budget and Control Board is required to maintain insurance reserve funds equal to five percent of the total insurance coverage in effect, which are held and invested by the State Treasurer. S.C. Code Ann. §§ 10-7-130, 10-7-140. When the insurance reserve fund exceeds five percent, the Board is required to reduce premium rates to "an amount which will be sufficient to maintain the insurance fund at five per cent of the total insurance in force." *Id.* § 10-7-140. Thus, if the Board prevails in this action, the recovered funds will be added to the insurance reserve funds. If the funds are already at five percent, then the State will directly benefit in the form of reduced premiums on property insurance that state agencies are required by law to obtain from the Board. *Id.* § 10-7-70. If, on the other hand, the funds are below five percent at the time the Board receives a recovery, the State would still benefit because the funds would be brought closer to the statutory five percent threshold, which triggers a premium reduction.

But any recovery in this case would inure to the benefit of South Carolina in a more direct manner, as well. South Carolina treats the insurance reserve funds as nothing more than a specific account of the funds held within the state treasury, and those funds are invested by the State Treasurer and subject to the direct legislative control of the General Assembly. In 2002, for example, the General Assembly redirected accrued interest from "accounts held by agencies of state government" to the general fund of the State during a period of state fiscal difficulty, *including $22,937,800 from the insurance reserve funds. See* Act of June 17, 2002, No. 289, Part IB § 72.97, *available at* http://www.scstatehouse.net/sess114_2001-2002/appropriations 2002/tap1b.htm#s72 (general appropriations act for fiscal year beginning July 1, 2002). In addition, the Appropriations Act required the Budget and Control Board to suspend required payments of annual premiums by state agencies into the insurance reserve funds, and,

instead, to collect the same amount and remit it to the general fund. *Id.* Part IB § 72.98. The State's exercise of direct control and dominion over the funds managed by the Budget and Control Board's Office of the Insurance Reserve Fund makes clear the State's control over any funds that might be recovered by the plaintiffs in this case. We conclude that these circumstances under the first factor affirmatively indicate the conclusion that the Office of the Insurance Reserve Fund functions as an arm or alter ego of the State.

The second and fourth factors — focusing on the autonomy of the public entity and how the entity is treated under state law — are closely related in this case. To make its argument under these factors, Hoover again focuses narrowly on the "Insurance Reserve Fund," as if it were an entity, and the role it plays in enabling the Budget and Control Board to provide insurance to public entities. The "Insurance Reserve Fund," however, is not an entity of any kind under South Carolina law. It is true that the Office managing the insurance reserve funds is an entity functioning as a division of the State Budget and Control Board. But under state law, it is nonetheless the Board itself that is statutorily authorized to offer insurance and maintain insurance reserve funds. *See* S.C. Code Ann. § 1-11-140(A) ("The *State Budget and Control Board* . . . is authorized to provide insurance for the State" (emphasis added)); *id.* § 10-7-10 ("All insurance on public buildings and on the contents thereof of the State . . . shall be carried by the *State Budget and Control Board*" (emphasis added)); *id.* § 10-7-130 ("[A]ll money received . . . from any other source connected with the insurance of public property . . . shall be held by the *Board* as insurance reserve funds" (emphasis added)); *id.* § 10-7-140 ("When the insurance reserve fund provided for in § 10-7-130 reaches the sum of five per cent of the total insurance in force, then annually thereafter the *State Budget and Control Board* shall proportionately decrease the premium of insurance" (emphasis added)); *id.* § 38-13-180 ("'[I]nsurance reserve fund' or 'funds' means the insurance reserve funds administered by . . . the *State Budget and Control Board* to provide liability and property insurance" (emphasis added)). It is true that the various divisions of the Budget and Control Board are administratively separate for carrying out their separate functions, but they are, nonetheless, fully accountable to and guided by the Budget and Control Board, indicating a lack of the significant autonomy that is relevant in this context.

Moreover, the Budget and Control Board's members are all state officials — the Governor, the State Treasurer, the Comptroller General, the Chairman of the Senate Finance Committee, and the Chairman of the House Ways and Means Committee. *See* S.C. Code Ann. § 1-11-10. Thus, just as the fact that all of the University of Maryland's governing decisionmakers were appointed by the Governor was a "key indicator of state control" in *Maryland Stadium Authority*, 407 F.3d at 264, so too is the fact here that all of the Budget and Control Board's members *are* state officials. There can be no doubt that in this way the State, through its top officials, retains ultimate veto power over the actions of the Board and its Office of the Insurance Reserve Fund.

It is not surprising therefore that state law provides that the Office of the Insurance Reserve Fund is also accountable to state inspectors. *See* S.C. Code Ann. § 38-13-190 (providing that the Director of the State Department of Insurance "shall examine the affairs of the insurance reserve funds" at least every three years and report to the Budget and Control Board, the Speaker of the House of Representatives, and the President of the Senate whether the funds are being administered, *inter alia*, "in the best interest of the State").

Also relevant to these factors (two and four) is the origin of the funds contained in the insurance reserve funds account. Although a significant portion of the premiums paid to the Board comes from municipalities, nearly every state agency is *required by law* to purchase property insurance from the Board. S.C. Code Ann. §§ 10-7-10, 10-7-70. Thus, through its yearly appropriations to state agencies, which in turn are required by law to remit premiums to the Board, South Carolina provides significant funding for the Board's insurance reserve funds. When state funding of this sort is considered in connection with the State's exercise of direct control over those funds, it can readily be concluded that the Office managing the insurance reserve funds does not have significant autonomy apart from the State.

Finally, with respect to the third factor — whether the entity is involved with statewide, as opposed to local or other non-state concerns — the circumstances again support the conclusion that the Office of the Insurance Reserve Fund is an arm of South Carolina. First, we note that the Budget and Control Board, of which the Office

of the Insurance Reserve Fund is but a division, unquestionably is involved primarily with matters of statewide concern. *See, e.g.*, S.C. Code Ann. § 1-11-55(2) (designating Board as "the single central broker for the leasing of real property for [state] governmental bodies" statewide); *id.* § 1-11-58 (authorizing Board to manage surplus property of state agencies); *id.* § 1-11-220 (authorizing Board to manage state automotive fleet). Hoover, however, focuses more narrowly on the fact that the Budget and Control Board's Office of the Insurance Reserve Fund provides insurance to numerous South Carolina municipalities, counties, and school districts, thereby involving itself in matters of local concern. *See* S.C. Code Ann. § 1-11-140(B). But even as the Board provides insurance to municipalities, counties, and school districts, it does so on a statewide basis in that it provides all municipalities, counties, and school districts in the State who wish public insurance with insurance "in the same manner provided for the procurement of this insurance for the State, its entities, and its employees." *Id.* (tort insurance); *see also id.* §§ 10-7-10 to 10-7-40 (providing that property insurance on state, county, and school buildings shall be carried by the Board, and that municipalities may, but are not mandated to, purchase insurance from the Board). More significant to the analysis here, the Board's insurance activities *are not limited* to local areas and entities, and the benefits of the Office's activities will not inure only to the residents of a local area. *Cf. Ram Ditta*, 822 F.2d at 459 (holding that circumstances weigh against finding alter ego status when the entity "has *no* involvement . . . beyond the borders of these two counties" and "the majority of benefits resulting from its operation . . . will inure *only* to the residents of those counties" (emphasis added)).

At bottom, when considering all of the factors, we conclude that the Office of the Insurance Reserve Fund is an arm or alter ego of the State of South Carolina and not an autonomous, independent state agency that enjoys citizenship for purposes of satisfying diversity jurisdiction.

### B

With respect to the two other plaintiffs, the Department of Mental Health and the Department of Disabilities and Special Needs, the issue of whether they are arms of the State requires less discussion.

Both were created as state agencies and are operated by state employees in furtherance of a state-wide mission. *See* S.C. Code Ann. §§ 1-3-10, 1-30-10(A), 44-9-10, 44-9-30, 44-20-210, 44-20-240. Both are funded by the State and are financially accountable to the State. And most importantly, *see Maryland Stadium Auth.*, 407 F.3d at 261-63, any recovery by these two agencies in this case would be returned to the State's general fund. *See* S.C. Code Ann. § 2-65-40(B)(5)(a) (requiring new revenues, such as litigation recoveries, to be remitted to State general fund). No discovery, as Hoover claims it should have received, could change their status, and we agree with the district court that both agencies are integral arms of the State. *See also S.C. Dep't of Mental Health v. Beazer E., Inc.*, No. 3-06-2718-CMC, 2006 WL 3703270, at *2-3 (D.S.C. Dec. 13, 2006) (applying the four factors and finding that the Department of Mental Health is the alter ego of South Carolina).

Because none of the plaintiffs is a "citizen" for purposes of diversity jurisdiction under 28 U.S.C. § 1332(a)(1), we affirm the district court's order vacating its earlier judgment and dismissing this case for lack of subject matter jurisdiction.

*AFFIRMED*