Affirmed in part, vacated in part, and remanded by published opinion. Judge MOTZ wrote the opinion, in which Judge KEENAN joined. Chief Judge TRAXLER wrote a separate opinion concurring in the judgment in part and dissenting in part.
DIANA GRIBBON MOTZ, Circuit Judge:
This appeal returns to us after remand to the district court. Dr. Jon Oberg, as relator for the United States, brought this action against certain student loan corporations, alleging that they defrauded the Department of Education and so violated the False Claims Act (“FCA” or “the Act”), 31 U.S.C. §§ 3729 et seq. (2006). The district court initially dismissed the complaint in its entirety. When Dr. Oberg appealed, we held that the court had not employed the proper legal framework — the arm-of-the-state analysis — in reaching its conclusion and thus vacated its judgment and remanded the case. See U.S. ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 579-81 (4th Cir.2012) (“Oberg I”). After applying the arm-of-the-state analysis on remand, the district court again concluded that all of the student loan corporations constituted state agencies not subject to suit under the Act and so again granted their motions to dismiss. For the reasons that follow, we affirm in part, vacate in part, and remand *135 for further proceedings consistent with this opinion.
I.
On behalf of the United States, Dr. Oberg brought this action against the Pennsylvania Higher Education Assistance Agency, the Vermont Student Assistance Corporation, and the Arkansas Student Loan Authority (collectively “appellees”). Appellees are corporate entities established by their respective states to improve access to higher education by originating, financing, and guaranteeing student loans.[1]
Dr. Oberg alleges that appellees defrauded the Department of Education by submitting false claims for Special Allowance Payments (“SAP”), a generous federal student loan interest subsidy. According to Dr. Oberg, appellees engaged in noneconomic sham transactions to inflate their loan portfolios eligible for SAP, and the Department of Education overpaid hundreds of millions of dollars to appellees as a result of the scheme. Dr. Oberg alleges that appellees violated the FCA when they knowingly submitted these false SAP claims.
The FCA provides a cause of action against “any person” who engages in certain fraudulent conduct, including “knowingly presenting], or causing] to be presented, a false or fraudulent claim for payment or approval” to an officer, employee, or agent of the United States. 31 U.S.C. § 3729(a)(1)(A). The Act does not define the term “person.” In Vermont Agency of Natural Resources v. United States, ex rel. Stevens, 529 U.S. 765, 787-88, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), the Supreme Court held that a state or state agency does not constitute a “person” subject to liability under the Act. But the Court also noted that corporations, by contrast, are “presumptively covered by the term ‘person.’ ” Id. at 782, 120 S.Ct. 1858 (emphasis in original). And three years later, the Court applied the latter presumption and held that municipal corporations like counties are ‘persons’ subject to suit under the FCA. See Cook Cnty. v. U.S. ex rel. Chandler, 538 U.S. 119, 122, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003).
Accordingly, a court must walk a careful line between two competing presumptions to determine if a state-created corporation is “truly subject to sufficient state control to render [it] a part of the State, and not a ‘person,’ for FCA purposes.” Oberg I, 681 F.3d at 579.[2] In the prior appeal, we held that the appropriate legal framework for this delicate inquiry is the arm-of-the-state analysis used in the Eleventh Amendment context. Id. at 579-80. Because the district court had not undertaken this analysis, we vacated its judgment and remanded the case to the district court for application of the proper legal framework. Id. at 581.
On remand, after applying the arm-of-the-state analysis, the district court con- *136 eluded that each appellee is part of its respective state and thus not a “person” under the Act, and so again granted appel-lees’ motions to dismiss pursuant to Fed. R.Civ.P. 12(b)(6). Dr. Oberg then timely noted this appeal.
On review of a Rule 12(b)(6) dismissal, we consider a case de novo. See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir.2011). We evaluate only whether the complaint states “a claim to relief that is plausible on its face.” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, we construe “facts in the light most favorable to the plaintiff,” Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir.2009), and “draw all reasonable inferences in [his] favor” Kolon Indus., 637 F.3d at 440. Yet “we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.” Kloth v. Microsoft Corp., 444 F.3d 312, 319 (4th Cir.2006). Nor do we credit allegations that offer only “naked assertions devoid of further factual enhancement.” Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotations marks, alteration, and citation omitted).
Moreover, in reviewing a Rule 12(b)(6) dismissal, we are not confined to the four corners of the complaint. It is well established that “we may properly take judicial notice of matters of public record,” including statutes. Philips v. Pitt Cnty. Mem’l Hosp., 572 F.3d 176, 180 (4th Cir.2009). We may also consider “documents incorporated into the complaint by reference,” Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), “as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic,” Philips, 572 F.3d at 180. Thus, before us, the parties properly cite to and rely on state statutes and exhibits integral to the complaint.
Finally, we note that although arm-of-the-state status may well constitute an affirmative defense in the related Eleventh Amendment context, this is not so in an FCA case. To succeed in an FCA case, a relator must demonstrate that a defendant is a “person” within the meaning of the Act. As the dissent recognizes, this is “a statutory question.” Dissent. Op. at 147. That is, personhood is an element of the statutory FCA claim, not an immunity providing a defense from suit as in the Eleventh Amendment context. See, e.g., U.S. ex rel. Adrian v. Regents of Univ. of Cal., 363 F.3d 398, 401-02 (5th Cir.2004) (dismissing FCA action on 12(b)(6) motion because “the FCA does not provide a cause of action against state agencies”).[3]
II.
In applying the arm-of-the-state analysis, we consider four nonexclusive factors to determine whether an entity is “truly subject to sufficient state control to render [it] a part of the state.” Oberg I, 681 F.3d at 579.
First, when (as here), an entity is a defendant, we ask “whether any judgment against the entity as defendant will be paid *137 by the State.” Oberg I, 681 F.3d at 580 (quoting S.C. Dep’t Disabilities & Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 303 (4th Cir.2008)).[4] The Supreme Court has instructed that in assessing this factor, an entity’s “potential legal liability” is key. Regents, 519 U.S. at 431, 117 S.Ct. 900; see also Parker v. Franklin Cnty. Cmty. Sch. Corp., 667 F.3d 910, 927-28 (7th Cir.2012) (focusing on legal liability for payment of a judgment in the wake of Regents), Cooper v. Se. Penn. Transp. Auth., 548 F.3d 296, 303 (3d Cir.2008)(same); U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah, 472 F.3d 702, 718 (10th Cir.2006) (same). Thus, we consider whether state law “provides that obligations of [the entity] shall not be binding on [the] State.” Lake Country Estates, Inc. v. Tahoe Reg’l Planning Agency, 440 U.S. 391, 402, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (emphasis in original). In doing so, we look to whether “State law indicates that a judgment against [the entity] can be enforced against the State.” Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 224 (4th Cir.2001).
An entity may also constitute an arm of the state “where the state is functionally liable, even if not legally hable.” Stoner v. Santa Clara Cnty. Office of Educ., 502 F.3d 1116, 1122 (9th Cir.2007) (emphasis added); see also Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 50, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) (“Where an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency.”) (internal quotation marks and alteration omitted).
Second, we assess “the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity’s directors or officers, who funds the entity, and whether the State retains a veto over the entity’s actions.” Oberg I, 681 F.3d at 580 (quoting Hoover Universal, 535 F.3d at 303). Also relevant to the autonomy inquiry is the determination whether an entity has the ability to contract, sue and be sued, and purchase and sell property, see Cash, 242 F.3d at 225; Ram Ditta, 822 F.2d at 458, and whether it is represented in legal matters by the state attorney general, see, e.g., Md. Stadium Auth. v. Ellerbe Becket, Inc., 407 F.3d 255, 264 (4th Cir.2005).
Third, we consider “whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns.” Oberg I, 681 F.3d at 580 (quoting Hoover Universal, 535 F.3d at 303). “Non-state concerns,” however, do not mean only “local” concerns, but rather also encompass other non-state interests like out-of-state operations. See Hoover Universal, 535 F.3d at 307 (characterizing this factor as “whether the entity is involved with statewide, as opposed to local or other non-state concerns ”) (emphasis added).
*138 Fourth, we look to “how the entity is treated under state law, such as whether the entity’s relationship with the State is sufficiently close to make the entity an arm of the State.” Oberg I, 681 F.3d at 580 (quoting Hoover Universal, 535 F.3d at 303). Whether an entity is an arm of the state is ultimately a question of federal law, “[b]ut that federal question can be answered only after considering the provisions of state law that define the agency’s character.” Regents, 519 U.S. at 429 n. 5, 117 S.Ct. 900. “In addressing this factor, a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question.” Md. Stadium Auth., 407 F.3d at 265 (internal quotation marks omitted).
With these principles in mind, we now apply arm-of-the-state analysis to each of the appellees.
III.
We initially consider the Pennsylvania Higher Education Assistance Agency (“PHEAA”). In 1963, the Pennsylvania General Assembly created PHEAA, which, according to PHEAA itself, now constitutes one of the nation’s largest providers of student financial aid services. Although PHEAA continues to administer state-funded student aid programs in Pennsylvania, it acknowledges that it also operates nationally under the names American Education Services and FedLoan Servicing.
The first factor in the arm-of-the-state analysis, whether Pennsylvania would pay a judgment against PHEAA in this case, weighs decidedly against holding that PHEAA is an arm of the state. For “instead of the state treasury being directly responsible for judgments against [PHEAA], [state law] expressly provides that obligations of [PHEAA] shall not be binding on [the] State.” Lake Country Estates, 440 U.S. at 402, 99 S.Ct. 1171 (emphasis in original). Pennsylvania explicitly disavows liability for all of PHEAA’s debts. See 24 Pa. Stat. § 5104(3) (2012) (“no obligation of the agency shall be a debt of the State”). In addition, state law emphasizes that PHEAA’s debts are not “payable out of any moneys except those of the corporation.” Id. Aside from state appropriations that go directly to students in the form of education grants, moreover, PHEAA’s substantial “moneys” derive exclusively from its own operations. The Pennsylvania treasury is thus neither legally nor functionally liable for any judgment against PHEAA. See Stoner, 502 F.3d at 1122.
Nevertheless, PHEAA contends that the important first factor weighs in favor of concluding that it is an arm of the state because state statutes require that its funds be deposited into the state treasury and that “no money” be paid from the treasury without approval from the state treasurer. See 24 Pa. Stat. § 5104(3); 72 Pa. Stat. § 307 (2013). This argument, however, ignores “a commonplace of statutory construction that the specific governs the general.” Morales v. Trans World Airlines, 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The statutory provisions specifically outlining PHEAA’s “powers and duties” clearly indicate that PHEAA’s board of directors — not the state treasurer — controls PHEAA’s funds. Those statutes provide that PHEAA’s funds “shall be available to the agency” and “may be utilized at the discretion of the board of directors for carrying out any of the corporate purposes of the agency.” 24 Pa. Stat. § 5104(3). Further, the state treasurer may use PHEAA’s funds only for purposes “consistent with guidelines approved by the board of directors.” Id.
Moreover, PHEAA’s funds are held in a segregated account apart from general *139 state funds. Id. § 5105.10. Our sister circuits have recognized that such an arrangement counsels against establishing arm-of-the-state status under this factor. The First Circuit, for instance, held that the University of Rhode Island is not an arm of its state in part because its funds are not “merged with[ ] the general fund, but are kept in segregated accounts [in the state treasury] pending discretionary disbursement by the [University’s] Board.” Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1210 (1st Cir.1993). Similarly, the Third Circuit, in assessing whether the Public School Employees’ Retirement Board of Pennsylvania was an arm of the state, remanded the case for further consideration in part because — like PHEEA’s account — the entity’s fund was “set apart in the state treasury from general state funds and [] administered by the State Treasurer at the discretion of the Board.” Blake v. Kline, 612 F.2d 718, 723 (3d Cir.1979) (footnote and citations omitted). In sum, because state law instructs that PHEAA would pay any judgment in this case with its own moneys from its segregated fund, see 24 Pa. Stat. § 5104(3) (2012), the first factor weighs heavily against holding that PHEAA is an arm of the state.
The second factor, the degree of autonomy exercised by the entity, presents a closer question. PHEAA’s board of directors is composed of gubernatorial appointees and state legislators or officials. See 24 Pa. Stat. § 5103 (repealed July 2010, but effective during the period when PHEAA allegedly violated the FCA). Such an arrangement frequently indicates state control. See Md. Stadium Autk, 407 F.3d at 264. Further, state officials exercise some degree of veto power over PHEAA’s operations. For example, the Auditor General may review PHEAA’s activities, 24 Pa. Stat. § 5108, and PHEAA must seek the approval of the Governor in order to issue notes and bonds, id. § 5104(3). These factors may mean, as PHEAA contends, that it is simply a tool of the state.
But other indicia relevant to the autonomy analysis — PHEAA’s source of funding, control over its revenues, and corporate powers — strongly suggest that PHEAA is not an arm of the state. Most critically, PHEAA is financially independent. According to its annual reports, which were attached to the amended complaint, PHEAA receives no operational funding from Pennsylvania. See also Appellees’ Br. 53 (conceding the point). Pennsylvania law, moreover, expressly instructs that PHEAA’s funds “shall be available to the agency,” and that PHEAA’s board may use those funds in any manner that furthers the agency’s corporate purposes. 24 Pa. Stat. § 5104(3). Meanwhile, the state treasurer’s use of PHEAA’s funds must adhere to “guidelines approved by the board” of PHEAA. Id. Finally, PHEAA has the power to enter into contracts, sue and be sued, and purchase and sell property in its own name, all of which suggest operational autonomy. See Cash, 242 F.3d at 225; Ram Ditto, 822 F.2d at 458. Although the facts relevant to this second factor cut both ways, when we consider “all reasonable inferences in favor of the plaintiff’ as we must at this stage, Kolon Indus., 637 F.3d at 440, we conclude that this factor also counsels against holding that PHEAA is an arm of the state.
The third factor is whether PHEAA “is involved with statewide, as opposed to local or other non-state concerns.” Hoover Universal, 535 F.3d at 307. Dr. Oberg poses two arguments relevant to this factor.
Initially, he contends that due to PHEAA’s commercial focus, its operations do not involve an area of legitimate state *140 concern. See Appellant’s Br. 43; Reply Br. 25-26. This argument fails. Pennsylvania created PHEAA to finance, make, and guarantee loans for higher education, and “[hjigher education is an area of quintessential state concern and a traditional state government function.” Md. Stadium Auth., 407 F.3d at 265. PHEAA does not provide higher education directly, but it nonetheless facilitates the attainment of education by supplying student financial aid services. This work is clearly of legitimate state concern.
Dr. Oberg’s remaining argument as to the third factor is that PHEAA’s operations from 2002 to 2006 — during the time in which PHEAA allegedly conducted fraudulent transactions in violation of the FCA — were so focused out of state that PHEAA was not involved primarily with state concerns.[5] See Ram Ditta, 822 F.2d at 459; cf. Hoover Universal, 535 F.3d at 307. To this end, Dr. Oberg alleges that “PHEAA conducts substantial operations outside of Pennsylvania,” and that as early as 2005, “one-third of PHEAA’s earnings c[a]me from outside the [CJommonwealth,” after which it further “expanded its operations.” PHEAA’s financial reports, cited throughout Dr. Oberg’s complaint, tend to corroborate these claims, so there is little doubt that during the period in question PHEAA’s operations extended well beyond the borders of Pennsylvania. Even so, if only one-third of PHEAA’s earnings came from outside Pennsylvania in 2005, it does not seem plausible that by 2006 — the last year encompassed by Dr. Oberg’s allegations — PHEAA’s operations focused primarily out of state. See Ram Ditta, 822 F.2d at 459; see also Iqbal, 556 U.S. at 678, 129 S.Ct. 1937 (explaining that “[w]here a complaint pleads facts that are merely consistent with a defendant’s liability, it stops short of the line between possibility and plausibility of entitlement to relief’) (internal quotation marks and citation omitted). Therefore, we believe this factor weighs in favor of arm-of-the-state status for PHEAA.
The final factor, how PHEAA is treated under state law, also supports PHEAA’s contention that it is an arm of Pennsylvania. A state statute provides that “the creation of the agency [was] in all respects for the benefit of the people ... and the agency [performs] an essential governmental function.” 24 Pa. Stat. § 5105.6. PHEAA’s enabling legislation was made effective by “amendment to the Constitution of Pennsylvania authorizing grants or loans for higher education,” id. § 5112, and Pennsylvania state courts have concluded that PHEAA is a state agency for jurisdictional purposes, see, e.g., Richmond v. Penn. Higher Educ. Assistance Agency, 6 Pa.Cmwlth. 612, 297 A.2d 544, 546 (1972); Penn. Higher Educ. Assistance Agency v. Barksdale, 303 Pa.Super. 281, 449 A.2d 688, 689-90 (1982).
In sum, although the third and fourth factors suggest that PHEAA is an arm of the state, the first (strongly) and second (albeit less strongly) point in the opposite direction. At this early stage, construing the facts in the light most favorable to the plaintiff, Nemet Chevrolet, 591 F.3d at 255, we must conclude that Dr. Oberg has alleged sufficient facts that PHEAA is not an arm of the state, but rather a “person” for FCA purposes. We therefore vacate the judgment of the district court as to PHEAA and remand to permit limited dis- *141 eovery on the question whether PHEAA is “truly subject to sufficient state control to render [it] a part of the state.” Oberg I, 681 F.3d at 579.
IV.
We next consider whether Dr. Oberg’s complaint states a plausible claim that the Vermont Student Assistance Corporation (“VSAC”) is a “person” subject to suit under the FCA. The Vermont legislature created VSAC in 1965 to provide Vermont residents with opportunities to attend college by awarding education grants and financing student loans. Vt. Stat. Ann. tit. 16, § 2821(a) (2013). According to VSAC’s financial statements — referenced repeatedly in Dr. Oberg’s complaint — the agency currently administers a state grant program and a higher education investment plan; originates, services, and guarantees student loans; and provides higher education information and counseling services.
The upshot of the first arm-of-the-state factor — who would pay a judgment in this case — is unclear. State law provides no definite guidance. On one hand, Dr. Oberg alleges that Vermont would not pay a judgment because the state disclaims legal liability for VSAC’s debts. Yet, in contrast to Pennsylvania, which disavows liability for any and all of PHEAA’s obligations, see 24 Pa. Stat. § 5104(3), Vermont does so only with respect to VSAC’s debt obligations issued to finance loans for higher education, see Vt. Stat. Ann. tit. 16, § 2823(f); id at § 2868®. Dr. Oberg has identified no state law indicating that a judgment obligation could not be enforced against the state, and we have found none. See Lake Country Estates, 440 U.S. at 402, 99 S.Ct. 1171 (finding relevant whether state law “provides that obligations of [the entity] shall not be binding on [the] State”).
On the other hand, VSAC’s contention that Vermont would pay a judgment rests on the state’s duty to “support and maintain” VSAC. Vt. Stat. Ann. tit. 16, § 2823(a). But an obligation stated in such general terms is not conclusive. Moreover, although state appropriations compose nearly twenty percent of VSAC’s revenues, such funding goes entirely to students in the form of need-based grants. Thus, whether Vermont would be legally or functionally liable for a judgment here is unclear. At this stage, however, we must construe all facts in the light most favorable to the plaintiff, Nemet Chevrolet, 591 F.3d at 255, so we assume that this critical (albeit not dispositive) first factor weighs against arm-of-the-state status for VSAC.
The second factor, VSAC’s degree of autonomy from the state, also presents a close question. Vermont law provides that eight members of VSAC’s eleven-member board of directors are either state officials or gubernatorial appointees, and that the board elects the remaining three members. Vt. Stat. Ann. tit. 16, § 2831. Moreover, Vermont retains important oversight authority over VSAC. The state “reserves the right at any time to alter, amend, repeal or otherwise change the structure, organization, programs, or activities” of VSAC, id. § 2821(b), and state law provides that VSAC may issue no debt obligation “without the approval in writing of the governor,” id. § 2823(f).
Other autonomy indicators, however, counsel against holding that VSAC is an arm of the state. VSAC not only exercises corporate powers including the capacity to contract and sue and be sued, see Cash, 242 F.3d at 225, it is also, like PHEAA, financially independent. VSAC’s financial statements, cited throughout the complaint, indicate that VSAC uses state appropriations only for need-based edu *142 cational grants; no state funds finance its operations. In addition, VSAC’s board is broadly empowered to adopt policies and regulations governing its lending activities, Vt. Stat. Ann. tit. 16, § 2834, and “to do any and all acts and things as may be necessary” to secure its debt obligations, id. § 2868(d). Thus, although we recognize that certain facts relevant to the autonomy analysis suggest that VSAC is an arm of the state, others weigh decidedly against that conclusion. Once again “draw[ing] all reasonable inferences in favor of the plaintiff,” Kolon Indus., 637 F.3d at 440, we believe this factor also counsels against holding as a matter of law that VSAC is an arm of the state.
As to the third factor, whether VSAC is involved with statewide concerns, Dr. Oberg alleges that this factor weighs against holding that VSAC is an arm of the state because “Vermont law allows VSAC to conduct business in other States” and the agency has “contracted with borrowers and companies outside Vermont.” But these assertions do not equate to an allegation that VSAC’s operations centered primarily outside Vermont at any point in time. See Ram Ditto, 822 F.2d at 459. Indeed, Dr. Oberg’s allegations here fall short even of those he offers as to PHEAA’s extra-state operations, which we have held do not rise to the level of establishing a plausible claim of arm-of-the-state status under this factor. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Rather, VSAC’s financial statements indicate that during the period in question the agency was focused on the statewide concern of facilitating postsecondary educational opportunities for residents of Vermont.
With respect to the fourth factor, how state law treats the entity, Dr. Oberg alleges that Vermont does not treat VSAC as it treats “true agencies of the state.” But in fact Vermont law expressly provides that VSAC “shall be an instrumentality of the state,” Vt. Stat. Ann. tit. 16, § 2823(a), exempts VSAC from all taxation, id. § 2825, and “designate^] [VSAC] as the state agency to receive federal funds assigned to the state of Vermont for student financial aid programs,” id. § 2823(c).
In sum, although the first and second factors present close questions, we must conclude in compliance with Rule 12(b)(6) that both weigh against holding VSAC an arm of the state. Accordingly, while the third and fourth factors suggest otherwise, we must also hold that Dr. Oberg’s allegations as to VSAC are sufficient to survive a motion to dismiss. This is so particularly given the first factor’s enduring importance. See supra at 137 n. 4. We recognize that some of Dr. Oberg’s allegations test the outer bounds of the plausibility standard, but at this juncture, we must construe all facts in the light most favorable to the plaintiff. We therefore vacate the judgment of the district court with respect to VSAC and remand to permit limited discovery on this question.
V.
Finally, we consider whether the Arkansas Student Loan Authority (“ASLA”) is an arm of the state of Arkansas. The state legislature created ASLA in 1977 to help Arkansas provide higher educational opportunities for its residents. Ark.Code Ann. § 6-81-102 (2013). ASLA currently originates and disburses student loans at postsecondary schools throughout the state. It also sponsors outreach services to increase awareness about financial aid in higher education.
In contrast to PHEAA and VSAC, all four factors weigh in favor of holding that ASLA is an arm of the state. First, although § 6-81-113 of the Arkansas Code disavows liability for debt obligations is *143 sued to finance student loans, it says nothing about liability for other debts like a judgment obligation. Critically, Arkansas statutes elsewhere indicate that state revenues would be used to satisfy a judgment against ASLA. State law instructs that “[a]ll moneys received by [ASLA]” from its lending operations are “specifically declared to be cash funds,” and further, that “cash funds” are “revenues of the state.” Id. at §§ 6 — 81—118(a)(1), 19-6-103. Accordingly, because ASLA’s income derives overwhelmingly from its lending activities, and because such income statutorily belongs to Arkansas, it follows that the state would foot the bulk of any judgment against ASLA. Dr. Oberg’s allegations to the contrary establish only a dubious possibility that ASLA could procure some “other income” with which to satisfy a judgment. See Reply Br. at 14. More is required to survive a motion to dismiss. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.
The dissent misses the mark in contending that Arkansas’s statutory scheme is “similar in many ways to that in Pennsylvania,” Dissent. Op. at 153 n. 4, and that state funds would not be used to satisfy a judgment against ASLA because, “in reality,” Arkansas “claims” only ASLA’s “surplus revenues,” Dissent. Op. at 153-54. Arkansas does not, “in reality,” “claim” only ASLA’s “surplus revenues” as revenues of the state. Arkansas law expressly provides that “all moneys” received by ASLA in connection with its lending activities are revenues of the state. Ark.Code Ann. §§ 6-81-118(a)(l), 19-6-103. And Arkansas law carefully cabins ASLA’s use of those state revenues to certain lending costs, id. § 6-81-118(b) — (c), an arrangement far removed from the Pennsylvania scheme granting PHEAA “discretionary]” authority to use its funds for any corporate purpose, see 24 Pa. Stat. § 5104(3).
The dissent also misses the mark in suggesting that our analysis here is “directly contrary” to that in Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994), for this contention ignores crucial differences between the two cases. While ASLA is a corporation created by a single state to further educational opportunities in that state, the Port Authority in Hess is a bistate “Compact Clause entity” with “diffuse” political accountability. Id. at 42, 115 S.Ct. 394. Because Congress must authorize the creation of such bistate entities, see U.S. Const. art. 1, § 10, cl. 3, they “owe their existence to [both] state and federal sovereigns” and so “lack the tight tie to the people of one State that an instrument of single State has,” Hess, 513 U.S. at 42, 115 S.Ct. 394. For this reason, the Supreme Court recognizes a “general approach” for Compact Clause entities, like the Port Authority, under which a court will “presume” that they are not arms of the state. Id. at 43, 115 S.Ct. 394. (Of course, the Court has established no similar “general approach” for state-created corporations like ASLA.)
Notwithstanding this presumption, and even though no state appropriated funds to the Port Authority or claimed the Authority’s income as its revenue, the Authority argued that it was an arm of a state because it dedicated some of its surplus to “public projects which the States themselves might otherwise finance.” Id. at 50, 115 S.Ct. 394. The Supreme Court had little difficulty rejecting that argument, noting that because the Authority was a profitable Compact Clause entity that retained and controlled its income, the associated states would not pay a judgment against it. Id. at 51, 115 S.Ct. 394. ASLA, by contrast, is “an instrument of a single [s]tate,” id. at 43, 115 S.Ct. 394, and state law expressly provides that all of its lending income belongs to that state. Thus, *144 state funds necessarily would be used to pay a judgment against ASLA. In sum, Hess does not in any way undermine our holding that this first factor indicates that ASLA is an arm of the state.[6]
As to the second arm-of-the-state factor, ASLA operates with little autonomy from Arkansas despite its corporate powers. State legislative records establish that, unlike Pennsylvania and Vermont, Arkansas provides its student loan corporation substantial funding.[7] Moreover, the Arkansas Attorney General represents ASLA in litigation, including the case at hand, and state law limits ASLA’s powers in several significant ways. For example, Arkansas subjects ASLA’s use of cash funds to approval by the General Assembly, Ark.Code Ann. § 19-4-802, and prevents its sale of bonds “until the bond issue has the written approval of the Governor after he or she has received the approval of the State Board of Finance,” id. § 6-81-108.
Critically, the Governor of Arkansas also appoints every member of ASLA’s board of directors. See id. § 6-81-102(d). “The fact that all of [an entity’s] decisionmakers are appointed by the Governor,” we have recognized, “is a key indicator of state control.” Md. Stadium Auth., 407 F.3d at 264; see also, Hoover, 535 F.3d at 307; Kitchen, 286 F.3d at 185; Cash, 242 F.3d at 225. The dissent all but ignores this fact, claiming instead that ASLA is autonomous because its board members serve fixed terms and may not be removed at will. Dissent. Op. at 155-56. This argument fails. Even where board members serve fixed terms, state authority to appoint all of an entity’s decisionmakers remains powerful evidence of state control. See Md. Stadium Auth., 407 F.3d at 258, 264 (stressing importance of power to appoint although board members “serve five year terms”). Arkansas law, moreover, is *145 equivocal with respect to the governor’s removal power. Indeed, it suggests that the governor may remove board members simply by selecting new ones, as appointments to ASLA’s board are for four-year terms “or until a successor is appointed.” Ark.Code Ann. § 6-81-102(e).
Third, with respect to whether ASLA is focused on state concerns, Dr. Oberg merely alleges that Arkansas law “allows ASLA to lend to any qualified borrower nationwide” and that ASLA “can and has entered into contracts with institutions outside Arkansas.” The operative question, however, is whether ASLA is primarily involved with state concerns. See Ram Ditta, 822 F.2d at 459. And Dr. Oberg has alleged no facts indicating that ASLA is not primarily involved with the state concern of helping to finance higher education for Arkansas residents. The dissent, while conceding that student-loan financing facilitates the important state goal of educating youth, maintains that ASLA is also engaged in non-state concerns like “the servicing of federal student loans.” Dissent. Op. at 155. But ASLA’s federal-loan servicing work did not begin until 2012, so is irrelevant to the question whether ASLA was a “person” within the meaning of the FCA from 2002 to 2006 when it allegedly violated the Act.
Fourth, as the dissent agrees, Arkansas law plainly treats ASLA as an arm of the state. ASLA was established by state law as “the instrumentality of the state charged with a portion of the responsibility of the state to provide educational opportunities.” Ark.Code Ann. § 6-81-102(c). Its lending revenues are statutorily defined as “revenues of the state,” id. §§ 6— 81-118, 19-6-103, and the Supreme Court of Arkansas has described ASLA as “a state agency created by ... the 1977 Acts of Arkansas,” Turner v. Woodruff, 286 Ark. 66, 689 S.W.2d 527, 528 (1985).
In short, we conclude that each of the four factors counsels in favor of holding that ASLA is an arm of the state. To be sure, as the dissent points out, arm-of-the-state analysis is a fact-intensive inquiry often ill suited to judgment on the pleadings. See Dissent. Op. at 156-57. But where, as with ASLA, the relevant facts are clear, Rule 12(b)(6) mandates dismissal. See, e.g., Stoner, 502 F.3d at 1121-23 (dismissing FCA action on 12(b)(6) motion); Adrian, 363 F.3d at 401-02 (same). We therefore hold that ASLA is an arm of Arkansas and so not subject to suit under the FCA.
VI.
We affirm the judgment of the district court with respect to ASLA. We vacate that portion of the district court’s judgment dismissing Dr. Oberg’s FCA claims against PHEAA and VSAC and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

. Dr. Oberg also sued other defendants not parties to this appeal. Among those defendants was another student loan corporation, the Kentucky Higher Education Student Loan Corporation, which reached a settlement with Dr. Oberg shortly before the most recent appeal.

. Dr. Oberg insists that only one presumption applies: that all corporate entities — regardless of their affiliation with a state — must overcome a "presumption of ‘personhood.’ ” Appellant's Br. 15. The dissent seems to agree. See Dissent. Op. at 146. But this assertion ignores the Supreme Court's clear instruction that in the context of corporations created by and sponsored by a state, competing presumptions are at play. See Stevens, 529 U.S. at 782, 120 S.Ct. 1858 (observing that "the presumption with regard to corporations is just the opposite of the one governing [state entities]”).

. The dissent’s suggestion to the contrary thus misses the mark. Tellingly, it offers only Eleventh Amendment cases in support of its contention that arm-of-the-state status is an affirmative defense. See Dissent. Op. at 146-47. But the Supreme Court has made clear that the statutory FCA question is distinct from the Eleventh Amendment inquiry. See Stevens, 529 U.S. at 779-80, 120 S.Ct. 1858 (explaining that the Court initially considers whether “the [FCA] itself permits the cause of action it creates to be asserted against States” before reaching the Eleventh Amendment sovereign immunity question).

. When an entity is a plaintiff, this factor requires us to determine "whether any recovery by the entity as plaintiff will inure to the benefit of the State.” Hoover Universal, 535 F.3d at 303. We previously regarded the first factor as "the most important consideration,” Ram Ditta v. Md. Nat’l Capital Park & Planning Comm'n, 822 F.2d 456, 457 (4th Cir.1987), and the dissent seems to regard it as dispositive, see Dissent. Op. at 149. But as we noted in Oberg I, 681 F.3d at 580 n. 3, more recent Supreme Court precedent suggests that although this factor remains of “considerable importance,” Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), it does not deserve dispositive preeminence, see Fed. Maritime Comm’n v. S.C. State Ports Auth., 535 U.S. 743, 765, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002).

. PHEAA counters that out-of-state operations are irrelevant because this factor is concerned only with whether an entity’s focus is statewide as opposed to local. The argument is misguided. Rather, this factor looks to "whether the entity is involved with statewide, as opposed to local or other non-state concerns." Hoover Universal, 535 F.3d at 307 (emphasis added).

. The dissent disputes this conclusion for two additional reasons. Relying on the principle that the “specific governs the general,” Morales, 504 U.S. at 384, 112 S.Ct. 2031, the dissent notes that only general statutory provisions — not those “exclusively applicable to ASLA” — define "cash funds” as "revenues of the state.” See Dissent. Op. at 152-53. But the principle of statutory construction on which the dissent relies applies only where general and specific statutory provisions conflict, or where a general provision would render a more specific one superfluous. See RadLAX Gateway Hotel, LLC v. Amalgamated Bank, - U.S. -, 132 S.Ct. 2065, 2071, 182 L.Ed.2d 967 (2012). The principle finds no footing where, as here, specific and general statutory provisions do not conflict, but rather go hand in hand. That is, the specific provision defining ASLA's revenues as "cash funds” is entirely consistent with the general provision declaring that "cash funds” are revenues of the state.
The dissent also posits that "the fact that ASLA’s funds are held in a segregated fund outside the state treasury counsels against arm-of-state status.” Dissent. Op. at 152. As a general rule, we agree that such an arrangement would weigh against holding that an entity is an arm of its state. But Arkansas is an exception to this general rule, because state law expressly declares agency income deposited outside the state treasury to be revenue of the state. Ark.Code Ann. § 19-6-103. In contrast to the dissent's suggestion, see Dissent. Op. at 153 n. 4, ASLA's statutory scheme thus operates nothing like that governing PHEAA.

. The dissent unconvincingly suggests that this funding is irrelevant to the autonomy inquiry because it derives from ASLA's own cash funds. Dissent. Op. at 153-54, 155. But the source of state funds used to support ASLA's operations matters not. What matters is whether an entity's funds belong to the state. See supra at 143-44. In this case, state law expressly provides that they do. Every dollar ASLA earns through its lending activities becomes a dollar of state revenue "to be used as required and to be expended only for such purposes and in such manner as determined by law.” Ark.Code Ann. § 19-6-103. That Arkansas, in its discretion, returns some of this money to ASLA to finance its operations does not change that fact.