TRAXLER, Chief Judge,
concurring in the judgment in part and dissenting in part:
This is an appeal from the granting of a Rule 12(b)(6) motion to dismiss, a motion that tests the plausibility of the plaintiffs allegations rather than the plaintiffs ability to ultimately prove his allegations or the defendant’s ability to establish a defense. In my view, plaintiff Jon Oberg’s Fourth Amended Complaint plausibly alleges that all of the defendant student-loan corporations (together, the “Loan Companies”) are “persons” against whom an action under the False Claims Act (the “FCA”) can be maintained. Whether the Loan Companies qualify as arms of their creating states is an affirmative defense that need not be anticipated or negated by the alie- *146 gations of the complaint, see Goodman v. Praxair, Inc., 494 F.3d 458, 466 (4th Cir.2007) (en banc), and is a question that cannot be finally resolved here without discovery and fact-finding by the district court.
Accordingly, I concur in that portion of the judgment vacating the dismissal of Oberg’s False Claims Act claims asserted against the Pennsylvania Higher Education Assistance Agency (“PHEAA”) and the Vermont Student Assistance Corporation (“VSAC”), but I dissent from the dismissal of the claims asserted against the Arkansas Student Loan Authority (“ASLA”).
I.
“The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint”; the motion “does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.” Butler v. United States, 702 F.3d 749, 752 (4th Cir.2012) (internal quotation marks omitted), cert. denied, — U.S.-, 133 S.Ct. 2398, 185 L.Ed.2d 1105 (2013).
To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege facts plausibly establishing the elements of his asserted cause of action. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); Walters v. McMahen, 684 F.3d 435, 439 (4th Cir.2012), cert. denied, — U.S. - — -, 133 S.Ct. 1493, 185 L.Ed.2d 548 (2013). While the plaintiff is not required to “forecast evidence sufficient to prove the elements of the claim,” he “must allege sufficient facts to establish those elements” and “advance [his] claim across the line from conceivable to plausible.” Walters, 684 F.3d at 439 (internal quotation marks omitted). When considering a motion to dismiss, we give no deference to legal conclusions asserted in the complaint, but we must accept all factual allegations as true. See id.
II.
Broadly speaking, the False Claims Act imposes liability on a “person” who knowingly presents a false or fraudulent claim for payment or knowingly makes or uses a false record or statement material to a false claim. See 31 U.S.C. § 3729(a)(1)(A) & (B). In order to survive the motion to dismiss, Oberg was therefore obliged to plead facts plausibly establishing that the named defendants are “persons” within the meaning of the FCA.
While states are not “persons” subject to qui tam actions under the FCA, see Vt. Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 787-88, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000), corporations, including municipal corporations like cities and counties, are “persons” under the Act, see Cook Cnty. v. United States ex rel. Chandler, 538 U.S. 119, 134, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003); see also 1 U.S.C. § 1 (“In determining the meaning of any Act of Congress, unless the context indicates otherwise[,] ... the word[ ] ‘person’ ... include[s] corporations -”). There is no dispute that each of the Loan Companies is a corporation, and Oberg alleged the corporate status of each Loan Company in his complaint. Because corporations are presumed to be “persons” under the FCA, Chandler, 538 U.S. at 126, 123 S.Ct. 1239, Oberg’s allegations of corporate status plausibly established that the Loan Companies are “persons” within the meaning of the FCA, see Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (“Factual allegations must be enough to raise a right to relief above the speculative level.”).
The Loan Companies, however, all contend that they are alter-egos or arms of *147 their creating states. The Companies therefore argue that they, like the states themselves, do not qualify as “persons” under the FCA. Arm-of-state status is an Eleventh-Amendmenh-based inquiry focused on determining whether a state-created entity is so closely related to the state that it should be permitted to share in the state’s sovereign immunity. See United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 580 (4th Cir.2012) (“Oberg I ”). Although this court has not addressed the issue, the circuits that have considered similar assertions of arm-of-state status have uniformly concluded that it is an affirmative defense to be raised and established by the entity claiming to be an arm of the state. See Sung Park v. Ind. Univ. Sch. of Dentistry, 692 F.3d 828, 830 (7th Cir.2012) (“[Sovereign immunity is a waivable affirmative defense.”); Aholelei v. Dep’t of Pub. Safety, 488 F.3d 1144, 1147 (9th Cir.2007) (“Eleventh Amendment immunity is an affirmative defense.... ” (internal quotation marks omitted)); Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 237-39 (2d Cir.2006) (treating Eleventh Amendment immunity “as akin to an affirmative defense”); see also Gragg v. Ky. Cabinet for Workforce Dev., 289 F.3d 958, 963 (6th Cir.2002) (“[T]he entity asserting Eleventh Amendment immunity has the burden to show that it is entitled to immunity, ie., that it is an arm of the state.”); Skelton v. Camp, 234 F.3d 292, 297 (5th Cir.2000) (holding that the party seeking immunity “bear[s] the burden of proof in demonstrating that [it] is an arm of the state entitled to Eleventh Amendment immunity”); Christy v. Pa. Turnpike Comm’n, 54 F.3d 1140, 1144 (3d Cir.1995) (“[T]he party asserting Eleventh Amendment immunity (and standing to benefit from its acceptance) bears the burden of proving its applicability.”). I believe these decisions were correctly decided and that the arm-of-state issue raised by the Loan Companies is an affirmative defense.[1]
Preliminarily, although a plaintiff must plead facts establishing that the court has jurisdiction over his claim, see, e.g., Pinkley, Inc. v. City of Frederick, 191 F.3d 394, 399 (4th Cir.1999), the arm-of-state issue here is not jurisdictional. Instead, as the Supreme Court made clear in Stevens, it is a statutory question of whether the defendants named by Oberg qualify as “persons” under the FCA. See Stevens, 529 U.S. at 779, 120 S.Ct. 1858 (distinguishing the question whether the FCA permits actions against states from whether the Eleventh Amendment would prohibit such an action and electing to resolve the case on statutory grounds).
Moreover, the arm-of-state claim operates like other affirmative defenses, in that the claim would preclude liability even if all of Oberg’s allegations of wrongdoing are true. See Emergency One, Inc. v. Am. Fire Eagle Engine Co., 332 F.3d 264, 271 (4th Cir.2003) (“[AJffirmative defenses share the common characteristic of a bar to the right of recovery even if the general complaint were more or less admitted to.” (internal quotation marks and alteration omitted)); Black’s Law Dictionary (9th ed.2009) (defining “affirmative defense” as “[a] defendant’s assertion of facts and arguments that, if true, will defeat the plain *148 tiffs or prosecution’s claim, even if all the allegations in the complaint are true.”). In my view, then, the arm-of-state status asserted by the Loan Companies must be treated as an affirmative defense. And once the arm-of-state issue in this case is recognized as an affirmative defense, the error in dismissing Oberg’s claims on the pleadings becomes apparent.
As noted above, a Rule 12(b)(6) motion “test[s] the sufficiency of a complaint” but “does not resolve contests ... [about] the merits of a claim or the applicability of defenses.” Butler, 702 F.3d at 752 (internal quotation marks omitted). A plaintiff therefore has no “obligation to anticipate” an affirmative defense by pleading facts that would refute the as-yet unasserted defense. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); see McMillan v. Jarvis, 332 F.3d 244, 248 (4th Cir.2003); Guy v. E.I. DuPont de Nemours & Co., 792 F.2d 457, 460 (4th Cir.1986); accord de Csepel v. Republic of Hungary, 714 F.3d 591, 607-08 (D.C.Cir.2013) (“[AJlthough it is certainly true that plaintiffs must plead the elements of their claims with specificity, they are not required to negate an affirmative defense in their complaint....” (internal quotation marks and alteration omitted)).
As our en banc court explained in Goodman, an affirmative defense may provide the basis for a Rule 12(b)(6) dismissal only “in the relatively rare circumstances ... [where] all facts necessary to the affirmative defense clearly appear on the face of the complaint.” Goodman, 494 F.3d at 464 (internal quotation marks and alteration omitted); see also Xechem, Inc. v. Bristol-Myers Squibb Co., 372 F.3d 899, 901 (7th Cir.2004) (“Only when the plaintiff pleads itself out of court — that is, admits all the ingredients of an impenetrable defense — may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)”).
Application of these principles to this case requires Oberg to plausibly allege that the Loan Companies are “persons” within the meaning of the FCA. Oberg did just that by alleging that the Companies are corporations operating independently of their creating states. The Loan Companies’ contrary claim that they are alter-egos of their creating states is an affirmative defense which they bear the burden of pleading and proving. Because Oberg had no obligation to anticipate that defense by alleging facts establishing that the multi-factored, factually intensive arm-of-state inquiry should be resolved in his favor, the dismissal of his claims at this stage of the proceedings is improper. See Butler, 702 F.3d at 752; Goodman, 494 F.3d at 464, 466.[2]
*149 III.
Even if Oberg were somehow required to allege that the Loan Companies are not arms of their states, I believe the allegations of the complaint are still more than sufficient to withstand the motion to dismiss.
As to PHEAA and VSAC, the majority concludes that Oberg’s allegations plausibly establish that the companies are not alter-egos of their creating states. Although I agree with the majority’s ultimate conclusion as to these defendants, I do not agree with the majority’s application of the Rule 12(b)(6) standard to the arm-of-state state factors. The sufficiency of the complaint as to PHEAA and VSAC is not a close question in my view, and I therefore concur only in the judgment vacating the dismissal of Oberg’s claims against PHEAA and VSAC. While the question is perhaps a bit closer as to the claims against ASLA, I nonetheless believe the Oberg has plausibly alleged facts establishing that ASLA is not an arm of the state of Arkansas. Accordingly, for the reasons set out below, I dissent from the majority’s affirmance of the Rule 12(b)(6) dismissal of Oberg’s claims against ASLA.
When determining whether an entity qualifies as an aim of the state, we consider four non-exclusive factors:
(1) whether any judgment against the entity as defendant will be paid by the State or whether any recovery by the entity as plaintiff will inure to the benefit of the State;
(2) the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity’s directors or officers, who funds the entity, and whether the State retains a veto over the entity’s actions;
(3) whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns; and
(4) how the entity is treated under state law, such as whether the entity’s relationship with the State is sufficiently close to make the entity an arm of the State.
Oberg I, 681 F.3d at 580 (quoting Dep’t of Disabilities & Special Needs v. Hoover Universal, Inc., 535 F.3d 300, 303 (4th Cir.2008)).
While the focus of the first factor is whether the “primary legal liability” for a judgment will fall on the state, Regents of Univ. of Ca. v. Doe, 519 U.S. 425, 428, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), we must also consider the practical effect of a judgment against the entity, see Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 51, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). “[I]f the State treasury will be called upon to pay a judgment against a governmental entity, then Eleventh Amendment immunity applies to that entity, and consideration of any other factor becomes unnecessary.” Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 223 (4th Cir.2001). “[Speculative, indirect, and ancillary impaet[s] on the State treasury,” however, are insufficient to trigger immunity. Id. at 225.
If the state would not be liable for a judgment rendered against the entity, we must then consider the remaining factors, which serve to determine whether the entity “is so connected to the State that the legal action against the entity would, despite the fact that the judgment will not be paid from the State treasury, amount to the indignity of subjecting a State to the *150 coercive process of judicial tribunals at the instance of private parties.” Id. at 224 (internal quotation marks omitted); see Fed. Mar. Comm’n v. S.C. State Ports Autk, 535 U.S. 743, 760, 122 S.Ct. 1864, 152 L.Ed.2d 962 (2002) (“The preeminent purpose of state sovereign immunity is to accord States the dignity that is consistent with their status as sovereign entities.”). In my view, Oberg’s complaint contains factually detailed, specific allegations addressing the treasury factor and the dignity factors so as to preclude the granting of the motion to dismiss.
A.
The complaint alleges that ASLA, not its creating state, would be liable for any judgment rendered against it. See J.A. 116-18. While that assertion is arguably a legal conclusion not entitled to be treated as true, see, e.g., Iqbal, 556 U.S. at 678, 129 S.Ct. 1937, the assertion is supported by specific factual allegations that are supported by statutes, financial reports, and other information specifically referenced in the complaint and properly considered in the context of a motion to dismiss. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007); Philips v. Pitt Cnty. Mem’l Hosp., 572 F.3d 176, 180 (4th Cir.2009). These allegations and information establish the following:
• ASLA is a corporation entitled to enter into contracts, own property, and sue and be sued in its own name. See ArkCode Ann. § 6-81-102(c) (establishing ASLA as a “public body politic and corporate, with corporate succession”).
• Arkansas has specifically disclaimed liability for ASLAs obligations. See Ark.Code Ann. § 6-81-113(a)(3).
• Arkansas law authorizes ASLA to pay expenses associated with its lending activities from the revenues earned from those activities. See Ark.Code Ann. §§ 6 — 81—118(e)(3), 6-81-124(c)(l).
• ASLA generates substantial income streams and relies on those income streams, rather than state appropriations, to support its business operations, and ASLA has substantial assets from which a judgment could be paid. See J.A. 781-827 (ASLA financial statements).
• ASLA has a line of credit provided by Arkansas. ASLA borrowed $50,000,000 under the line of credit in 2008 and repaid the note in full by September 2010. See J.A. 802. ASLA has also borrowed money from a private lender to improve its liquidity, with student loan revenues providing the source of repayment. See J.A. 802.
• ASLA has commercial insurance to protect itself from losses arising out of torts and its errors and omissions. See J.A. 805.
In my view, these allegations are more than sufficient to make plausible Obergs assertion that the Arkansas state treasury would not be liable for a judgment rendered against ASLA. See Robertson v. Sea Pines Real Estate Cos., 679 F.3d 278, 288 (4th Cir.2012) (“Plausibility requires that the factual allegations be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.” (internal quotation marks and alteration omitted)).
Although the majority considers ASLA’s status as a corporation only when analyzing the state-dignity factors, that fact is clearly relevant to the state-treasury factor as well. See Cash, 242 F.3d at 224 (considering entity’s corporate form when analyzing state-treasury factor). The fact that Arkansas elected to structure ASLA as a corporation makes it plausible that the state will not be liable for any judgments in this case, since insulating others *151 from liability for corporate debt is one of the signal attributes of the corporate form. See, e.g., Musikiwamba v. ESSI, Inc., 760 F.2d 740, 753 (7th Cir.1985) (“General corporation law is clear that personal liability for a corporation’s debts cannot be imposed on a person merely because he is an officer, shareholder, and incorporator of that corporation.”). That Arkansas has specifically disclaimed liability for ASLA’s obligations further establishes plausibility, particularly given the absence of any statute requiring Arkansas to pay a judgment against ASLA. See Cash, 242 F.3d at 224-25 (noting the absence of statute authorizing recovery from state coffers when concluding that judgment against entity would not affect state treasury); Gray v. Laws, 51 F.3d 426, 436 (4th Cir.1995) (noting the absence of statute requiring payment by state).
Moreover, the allegations of the complaint and the financial documents referenced in the complaint show that ASLA generates significant revenue streams through its lending and other business activities. ASLA uses those revenues, as required by state law, to pay the expenses of its business activities. In light of these revenue streams, ASLA’s ability to raise revenues through other sources, see J.A. 802 (line of credit and private lending available to ASLA), and its insurance protection, it is entirely plausible a judgment in this case will have no legal or practical effect on the Arkansas state treasury. See Burrus v. State Lottery Comm’n, 546 F.3d 417, 420 (7th Cir.2008) (concluding that state lottery commission was not an arm of the state, in part because the lottery “has no need for recourse to the state treasury” given the “large stream of revenue” it generates).
B.
The allegations of Oberg’s complaint likewise plausibly demonstrate that ASLA has significant autonomy and independence from its creating state. The allegations of the complaint and the documents referenced therein establish the following:
• ASLA is a corporation entitled to enter into contracts, own property, and sue and be sued in its own name. See Ark.Code Ann. § 6 — 81—102(¿).
• ASLA is governed by a board of directors, none of whom are state officials, who serve fixed terms and are not removable by the governor. See id. § 6-81-102(d) & (e).
• ASLA has authority to structure and operate its business activities as it deems proper, including the authority to issue general obligation bonds secured by its revenues and to create subsidiary corporations. See id. §§ 6-81-102(k), 6-81-102(i )(8)-(10) & (25).
• ASLA is supported by the revenues it earns from its business activities, not by the state. Although ASLA receives appropriations from the state earmarked for salaries and certain operating expenses, the funds so appropriated are “cash funds” earned by ASLA through its business activities. See Ark.Code Ann. § 6-18-118; J.A. 412.
• ASLAs revenues are not deposited into the state treasury, but are deposited into various accounts controlled by ASLA. See Ark. Stat. § 6-81-118(a) & (f).
• ASLAs business activities extend outside the state of Arkansas and include the buying and selling of loan pools on the secondary market and the servicing of loans made directly by the federal government.
• ASLA has borrowed and repaid money from the state of Arkansas, executing a promissory in favor of the state and using its revenues to repay the loan. See J.A. 802.
*152 These allegations are not naked factual assertions that need not be accepted as true, nor are they mere legal conclusions that can be disregarded. See Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Instead, they are specific, detailed factual allegations that paint a plausible picture of an autonomous corporation operating in the commercial sphere largely free of state oversight or interference, such that it would not be an affront to the dignity of Arkansas to permit this action to proceed.
Accordingly, given the operational independence established by these allegations, and the financial independence established by the state-treasury allegations discussed above, I believe it is at least plausible that ASLA is a “person” within the meaning of the FCA, not an arm of the state of Arkansas. See id. (“A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.”).
IV.
ASLA, however, makes various arguments about how a judgment could affect the state treasury and points to various statutes indicating that the state has more control over it than Oberg’s allegations suggest. In my view, these arguments do not provide a basis for granting the motion to dismiss. Even after Twombly and Iqbal, we still must view the properly alleged facts in the plaintiffs favor and must give the plaintiff the benefit of all reasonable inferences that can be drawn from those facts. See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir.2011); see also Sepulvedar-Villarini v. Dep’t of Educ. of P.R., 628 F.3d 25, 30 (1st Cir.2010) (Souter, J.) (“A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss .... ”). While ASLA’s arguments are not frivolous, they are not so conclusive as to render Oberg’s allegations implausible for purposes of Rule 12(b)(6). See Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir.2011) (“Plaintiffs complaint may be dismissed only when defendant’s plausible alternative explanation is so convincing that plaintiffs explanation is implausible.”); Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 458 (6th Cir.2011) (“[T]he plausibility of [the defendants’ theory] does not render all other reasons implausible.”).
A.
ASLA argues that a judgment against it would affect the state treasury. Arkansas law requires the revenues from ASLA’s business activities to be deposited into accounts outside the state treasury. See Ark.Code Ann. § 6-81-118(a), (b) & (f). Under provisions of Arkansas law not exclusively applicable to ASLA, all funds required to be deposited somewhere other than the state treasury are “ ‘cash funds’ ” that are “declared to be revenues of the state to be used as required and to be expended only for such purposes and in such manner as determined by law.” Ark. Code Ann. § 19-6-103. Such cash funds must be “budgeted and proposed expenditures approved by enactments of the General Assembly.” Id. § 19-4-802(a). Relying on these statutes, ASLA contends that a judgment against it is, as a practical matter, a judgment against Arkansas, since all of ASLA’s money is really the state’s money under § 19-6-103.
ASLA’s argument overlooks several important points. First of all, as the majority noted in its discussion of PHEAA’s arm-of-state assertion, the fact that ASLA’s funds are held in a segregated fund outside the state treasury counsels against arm-of-state status. See Majority Op. at 138-39; see also Burrus, 546 F.3d at 420; *153 Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200, 1210 (1st Cir.1993). Moreover, unlike the generally applicable § 19-6-103, the statute specifically addressing ASLA’s funds does not declare ASLA’s cash funds to be revenues of the state, see Ark.Code Ann. § 6-18-118, and nothing in § 6 — 18— 118 appears to subject ASLA’s use of the funds to wholesale control by the General Assembly.[3] Instead, § 6-18-118 simply requires ASLA’s segregated cash funds to be “used as provided in this subchapter”— subchapter 1 of Chapter 81 governing student loans. Id. § 6 — 18—118(b) (emphasis added). Subchapter 1, in turn, gives ASLA — not the state legislature — nearly complete authority over the use of its funds, including the authority to pay expenses arising from its lending activities. See Ark.Code Ann. § 6 — 81—118(c)(3) & (4) (giving ASLA authority to “use the proceeds of any bond issues, together with any other available funds” for “[playing incidental expenses in connection with loans” and “[playing expenses of authorizing and issuing bonds”); id. § 6-81-118(f) (“The revenues not deposited into the State Treasury shall be deposited into an account or accounts specified by resolution of the authority and used for carrying out the provisions of any resolution, indenture securing bonds of the authority, or other agreement of the authority under this sub-ehapter.”); id. § 6-81-124(a) (requiring “[a]ll proceeds derived from a particular obligation” to be deposited into a “proceeds fund” to be “expended only on approval of [ASLA]”); id. § 6-81-124(c)(l) (authorizing funds contained in proceeds fund to be used for “payment of the necessary expenses, including, without limitation, the costs of issuing the authority’s obligations, incurred by the authority in carrying out its responsibilities under this subchapter”).[4]
More importantly, however, the fact that Arkansas declares all of ASLA’s cash funds to be state funds does not conclusively establish that the Arkansas state treasury would be affected by a judgment against ASLA in this case. As shown by the relevant statutes and other information in the record, the cash funds “claimed” by the state consist entirely of revenues generated by ASLA’s lending and other business activities. And because the expenses of those business activities must be paid from the cash funds, the funds so claimed by the state in reality consist only of ASLA’s surplus revenues.
As the Supreme Court has explained, however, the state-treasury factor focuses “not on the use of profits or surplus, but rather ... on losses and debts.” Hess, 513 U.S. at 51, 115 S.Ct. 394 (emphasis *154 added). “If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is ‘No’ — both legally and practically — then the Eleventh Amendment’s core concern is not implicated.” Id.
The majority’s assertion that the source of the cash funds claimed by Arkansas does not matter because Arkansas claims all of the cash funds as its own, see Majority Op. at 144 n. 7, thus seems directly contrary to the Supreme Court’s analysis in Hess. Under the majority’s view, a self-supporting entity — that is, an entity that supports itself not through state appropriations but through the revenues earned from its own commercial activities — is dependent on the state as a matter of law because a state statute arguably declares the entity’s profits to be revenues of the state. The Supreme Court raised a suspicious eyebrow at such an argument in Hess, see 513 U.S. at 51 n. 21, 115 S.Ct. 394 (observing that “[i]t would indeed heighten a mystery of legal evolution were we to spread an Eleventh Amendment cover over an agency that consumes no state revenues but contributes to the State’s wealth” (internal quotation marks and alteration omitted)), and the argument is no more persuasive here.
Oberg’s allegations of a self-supporting, commercially insured corporation with tens of millions of dollars in annual revenue and access to a $50 million line of credit and other private loans provide a non-speculative basis for concluding that ASLA would not need Arkansas’s help to pay a judgment rendered against it.[5] Nothing more need be established at this point in the proceedings. See Twombly, 550 U.S. at 555, 127 S.Ct. 1955 (“Factual allegations must be enough to raise a right to relief above the speculative level.”); Walters, 684 F.3d at 439 (plaintiffs allegations must be sufficient to “advance [his] claim across the line from conceivable to plausible”).
B.
The state-dignity factors of the arm-of-state inquiry include (1) “the degree of autonomy exercised by the entity”; (2) “whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns”; and (3) “how the entity is treated under state law.” Oberg I, 681 F.3d at 580. As previously discussed, I believe that Oberg’s allegations of a corporate entity that is answerable to boards of directors rather than elected state officials and that operates largely free of state interference plausibly establish that ASLA is not “so connected to the State that the legal action against the entity would, despite the fact that the judgment will not be paid from the State treasury, amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.” Cash, 242 F.3d at 224 (internal quotation marks omitted).
I recognize, however, that other inferences can reasonably be drawn from the information alleged in the complaint and contained in the record. Nonetheless, the question at this stage of the proceedings is not whether the defendant’s view of the issues is reasonable, but whether the plaintiff has plausibly alleged an entitlement to relief. See, e.g., Butler, 702 F.3d at 752 (motion to dismiss “test[s] the sufficiency of a complaint” but “does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses” (internal quotation marks omitted)). And in *155 my view, the state-dignity factors do not conclusively establish that the Loan Companies are arms of their creating states, notwithstanding the fact that some of the factors might reasonably support that conclusion.
For example, Arkansas appears to treat ASLA as a state agency. See Ark.Code Ann. § 6-81-lQ2(c) (describing ASLA an “an instrumentality of the state”); Turner v. Woodruff, 286 Ark. 66, 689 S.W.2d 527, 528 (1985) (describing ASLA as a “state agency”). While this factor thus points toward a finding of arm-of-state status, whether an entity qualifies as an arm of its creating state is a matter of federal law, see Regents, 519 U.S. at 429 n. 5, 117 S.Ct. 900, and this single factor is not dispositive of the inquiry.
In addition, there can be no dispute that ASLA is involved, at least in part, in matters of statewide concern. “[E]ducating the youth” of a state and providing higher education is “clearly an area of statewide concern,” Md. Stadium Auth. v. Ellerbe Becket Inc., 407 F.3d 255, 265 (4th Cir.2005), and making loans available to students certainly facilitates that goal. However, ASLA is also engaged in other, more commercial activities, such as the buying and selling of loan pools on the secondary market and the servicing of federal student loans, that arguably are more appropriately characterized as “non-state concerns.” See Hoover Universal, 535 F.3d at 307 (considering “whether the entity is involved with statewide, as opposed to local or other non-state concerns ” (emphasis added)); cf. Fresenius Med. Care Cardiovascular Res., Inc. v. Puerto Rico, 322 F.3d 56, 64 (1st Cir.2003) (“Not all entities created by states are meant to share state sovereignty.... Some entities may be meant to be commercial enterprises, viable and competitive in the marketplace in which they operate.”).
As to the question of autonomy, the fact that ASLA generates its own revenues and is not dependent on state appropriations is a strong indication of the Loan Companies’ operational independence from the states. While ASLA receives an appropriation earmarked for salaries and certain other expenses, it is an appropriation of ASLA’s own “cash funds,” J.A. 412, which, as previously discussed, are funds generated by ASLA through its business activities. That kind of appropriation does not make ASLA dependent on the state. See Bur-ras, 546 F.3d at 422 (appropriation of funds generated by entity claiming arm-of-state status “is of a different kind than the appropriations we have found to be the mark of a state agency, namely, those appropriations that come directly from the state.” (internal quotation marks omitted)).[6]
Other facts, however, suggest that ASLA is not entirely autonomous. For example, all members of ASLA’s board of directors are appointed by the governor, see Ark. Stat. Ann. § 6-81-102(d), a fact that clearly provides some indication of state control. See Md. Stadium Auth., 407 F.3d at 264. Arkansas law, however, provides that the board members serve fixed terms, see Ark. Stat. Ann. § 6-81-102(e), with no suggestion that they may be removed by the governor at will.[7] See *156 Edmond v. United States, 520 U.S. 651, 664, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997) (“The power to remove officers, we have recognized, is a powerful tool for control.”); Auer v. Robbins, 519 U.S. 452, 456 n. 1, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (concluding that Board of Police Commissioners was not an arm of the state because the state was not responsible for the Board’s financial liabilities and the only form of state control was the governor’s power to appoint four of five Board members); P.R. Ports Auth. v. Fed. Mar. Comm’n, 531 F.3d 868, 877 (D.C.Cir.2008) (“The Governor’s power to remove a majority of the Board at will allows him to directly supervise and control PRPA’s ongoing operations.”); Takle v. Univ. of Wisc. Hosp. & Clinics Auth., 402 F.3d 768, 770 (7th Cir.2005) (“[T]he power to appoint is not the power to control.”).[8]
In addition, all bonds issued by ASLA must be approved by the governor, a fact the majority finds significant. See Majority Op. at 144 (including gubernatorial approval requirement among the facts establishing that ASLA “operates with little autonomy”). The approval requirement, however, is a function of federal law, which places a ceiling on the volume of certain tax-exempt “private activity” bonds (including student loan bonds) that can be issued within a state and vests with the state governor the authority to change the allocation of the state ceiling among issuers, and which requires state approval of such bond issues. See 26 U.S.C. § 141(e)(1)(E); id. § 144(b); id. § 146(a)-(e); id. § 147(f); see generally Steele v. Indus. Dev. Bd. of Metro. Gov’t Nashville, 301 F.3d 401, 404 (6th Cir.2002); Congressional Research Service, Tax-Exempt Bonds: A Description of State & Local Government Debt at 9-11 (June 19, 2012). Under these circumstances, the gubernatorial-approval requirement is less indicative of a lack of autonomy than it might otherwise be. In any event, the gubernatorial-approval requirement does not conclusively establish that ASLA lacks autonomy.
Thus, on the record before us, the facts relevant to the state-dignity factors cut both ways, with some supporting Oberg’s claim that ASLA is not an arm of the state, and others supporting ASLA’s contrary claim. But because Oberg’s allegations on this point more than satisfy the Iqbal-Twombly plausibility requirement, ASLA’s arguments provide no basis for affirming the dismissal of Oberg’s claims.
V.
As is apparent from the arm-of-state test itself and the nature of the considerations it entails, whether a state-created entity is so closely connected to its creat *157 ing state that it should be permitted to share in the state’s immunity from suit generally is a fact-intensive inquiry dependent on an understanding of the actual operations of the entity and the actual relationship between the entity and the state. See, e.g., Hess, 513 U.S. at 49, 115 S.Ct. 394 (considering the entity’s “anticipated and actual financial independence (emphasis added)); Hoover, 535 F.3d at 303 (“The line separating a State-created entity functioning independently of the State from a State-created entity functioning as an arm of the State or its alter ego is determined by the particular legal apd factual circumstances of the entity itself.” (emphasis added)); Gray, 51 F.3d at 434 (remanding case to the district court because it was “in the best position to address in the first instance the competing questions of fact and state law necessary to resolve the eleventh amendment issue” (internal quotation marks omitted)). While there certainly have been and will continue to be cases where the arm-of-state issue can be resolved on the pleadings, multi-factored balancing tests “do[] not easily lend [themselves] to dismissal on a Rule 12(b)(6) motion.” Decotiis v. Whittemore, 635 F.3d 22, 35 n. 15 (1st Cir.2011). In my view, this case is one of the typical cases that cannot be resolved on the pleadings. Indeed, the inconclusive nature of most of the state-dignity factors highlights this very problem. We have no information about the actual operations of the Loan Companies or the actual amount of control and oversight exercised by the states and thus cannot determine the actual nature of the relationship between the Loan Companies and their creating states.
Nonetheless, the facts as alleged by Oberg plausibly establish that the state treasuries will not be affected by a judgment against the Loan Companies and that the Loan Companies are sufficiently independent from their creating states that permitting this action to proceed would not be an affront to the dignity of the states. To require anything more at this stage of the proceedings is to ignore the purpose and scope of a motion to dismiss, which is to test the facial sufficiency of the complaint, not resolve contests about the merits or applicable defenses. See Butler, 702 F.3d at 752; Goodman, 494 F.3d at 464.
Accordingly, while I concur in the judgment insofar as it vacates the dismissal of the claims against PHEAA and VSAC, I dissent from the opinion and judgment affirming the dismissal of the claims against ASLA.

. In our first opinion, we concluded that the district court had not applied the arm-of-state analysis, and we remanded the case for the district court to apply that analysis in the first instance. See United States ex rel. Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 581 (4th Cir.2012). While we noted that the ultimate question of whether the Loan Companies were subject to suit under the FCA did not turn solely on their corporate status, see id. at 579, we did not consider the sufficiency of Oberg's allegations or address whether arm-of-state status was an affirmative defense.

. The majority's apparent view that arm-of-state status is an affirmative defense in the Eleventh Amendment context but not in this case is puzzling. Although the arm-of-state inquiry here presents a statutory rather than constitutional question, the principles at stake are the same as in any case raising Eleventh Amendment issues. If arm-of-state status is a waivable affirmative defense when the Eleventh Amendment is directly implicated, so too should it be a waivable affirmative defense when the Eleventh Amendment is indirectly implicated. While "personhood” is clearly an element of a plaintiffs claim under the FCA, Oberg, as previously discussed, carried his burden of demonstrating the Loan Companies’ personhood by alleging their independent corporate status. The burden should then fall to the defendants to plead and prove that they are not persons but rather are arms of their creating state. United States ex rel. Adrian v. Regents of University of California, 363 F.3d 398 (5th Cir.2004), the case relied on by the majority, does not suggest otherwise. In that case, the plaintiff brought an FCA action against an entity — the Regents of the University of California — that courts had repeatedly found to be an arm of the state. See id. at 401-02. The Fifth Circuit did not address the affirmative-defense issue, but its affirmance of a Rule 12(b)(6) dismissal of the claims against *149 an entity previously found to be an arm of the state is consistent with the rule recognized by this court in Goodman that an affirmative defense may be resolved on a Rule 12(b)(6) motion when the facts necessary to the defense appear on the face of the complaint. See Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir.2007) (en banc).

. As the majority recognized when considering PHEAA’s claim, the terms of the statute specifically governing ASLA should be given priority over the generally applicable § 19-6-103. See Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) ("[I]t is a commonplace of statutory construction that the specific governs the general....”).

. Arkansas’ statutory arrangement thus is similar in many ways to that in Pennsylvania. Like Arkansas, Pennsylvania law appears to treat the Loan Company's funds as state funds, see 24 Pa. Stat. § 5104(3) (requiring PHEAA’s funds to be deposited into state treasury), and to require state approval of any expenditure of those funds, see 72 Pa.Stat. § 307, but the statute specifically governing PHEAA’s operation gives control of those funds to the company, see 24 Pa. Stat. § 5104(3); see Majority Op. at 137-39 (describing operation of Pennsylvania statutes governing PHEAA). After considering Pennsylvania’s statutory structure, the majority concluded that the state-treasury factor “weighs heavily against holding that PHEAA is an arm of the state.” Majority Op. at 139. In my view, Arkansas' similar statutory scheme also weighs against arm-of-state status.

. Indeed, the financial statements referenced in the pleadings show that ASLA absorbed an operational loss in 2011 without any financial assistance from the state. See J.A. 790.

. In any event, even if ASLA did receive some money from the state, that fact alone would not conclusively establish that ASLA is dependent on the state. See, e.g., Kitchen v. Upshaw, 286 F.3d 179, 184-85 (4th Cir.2002) (finding that an entity that received some state funding was not an arm of the state); Cash, 242 F.3d at 224, 226 (same).

. According to the majority, the fact that ASLA board members serve for four years “or until a successor is appointed," Ark.Code § 6-81-102(e), “suggests that the governor *156 may remove board members simply by selecting new ones.” Majority Op. at 145 (emphasis added). It seems highly unlikely that the Arkansas legislature would hide removal-at-will authority in a clause that more reasonably seems to authorize terms of more than four years in cases where an appointment is not timely made. In any event, an ambiguous statutory scheme is far from sufficient to establish for purposes of a Rule 12(b)(6) motion that ASLA's board is subject to the direct control of the governor.

. Contrary to the majority's characterization of my views, I do not contend that ASLA "is autonomous” because of the manner in which its board is appointed, Majority op. at 144 (emphasis added), only that Oberg has alleged specific facts relevant to ASLA’s autonomy sufficient to survive a Rule 12(b)(6) motion. As I have previously discussed, the fact that other inferences can be drawn from the information in the record does not render Oberg’s allegations implausible. See Sepulveda-Villarini v. Dep’t of Educ. of P.R., 628 F.3d 25, 30 (1st Cir.2010) (Souter, J.) ("A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss.... ”).