Lee PELE, Plaintiff,

v.

PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, d/b/a American Education Services, Defendant.

No. 1:13cv1531 (JCC/TRJ).

United States District Court,
E.D. Virginia,
Alexandria Division.

Signed Oct. 7, 2014.

Alexander Hugo Blankingship, III, Thomas Bryan Christiano, Blankingship & Christiano PC, Reston, VA, for Plaintiff.

Jill Marie Degraffenreid, Erin Pence Thompson, Hunton & Williams, McLean, VA, William Edward Potts, Jr., Hunton & Williams LLP, Washington, DC, for Defendant.

### *MEMORANDUM OPINION*

JAMES C. CACHERIS, District Judge.

The Court must decide whether the Pennsylvania Higher Education Assistance Agency ("Defendant" or "PHEAA") is an "arm of the state" of Pennsylvania, such that it would enjoy immunity from suit under the Eleventh Amendment to the Constitution. Now before the Court is PHEAA's Motion for Summary Judgment on that affirmative defense of immunity, [Dkt. 57], and Plaintiff Lee Pele's ("Plaintiff" or "Pele") cross-motion for Partial Summary Judgment, [Dkt. 68]. For the following reasons, the Court holds that PHEAA is an arm of the state of Pennsylvania and entitled to immunity under the Eleventh Amendment. Therefore, the Court will grant PHEAA's Motion for Summary Judgment.

## I. Background

### A. Factual Background

This case arises out of alleged violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.* Pele, a resident and citizen of Virginia, alleges that he received federal student loans that were serviced by PHEAA, a company that furnishes information to consumer reporting agencies as contemplated by FCRA. (Am. Compl. [Dkt. 8] ¶¶ 1–3.) Pele claims that PHEAA listed defaulted student loans on his credit file that "he never authorized, initiated, received the proceeds [from] or guaranteed." (*Id.* ¶¶ 5, 6.) Consequently, Pele received phone calls from debt collector Windham Professionals ("Windham") seeking over $137,000 in defaulted student loans. (*Id.* ¶ 7.) Pele maintained that he "did not initiate, guaranty, or receive any benefit" from these loans. (*Id.*) Pele sent credit dispute letters to credit reporting agencies TransUnion, Equifax, and Experian. (*Id.* ¶ 14.) In response, the credit reporting agencies sent four Automated Credit Dispute Verifications ("ACDV") to PHEAA. (*Id.* ¶¶ 21–23.) PHEAA responded to all four ACDVs "by modifying, but not deleting, the information from Mr. Pele's credit file." (*Id.* ¶ 24.) Pele alleges that as a result, "PHEAA continued to attribute debts to Mr. Pele to the credit reporting agencies." (*Id.*)

### B. Procedural Background

Pele filed the original complaint in this matter on December 13, 2013, [Dkt. 1], and filed an amended complaint as a matter of right under the federal rules on February 3, 2014 [Dkt. 8]. PHEAA moved to dismiss the amended complaint, arguing that PHEAA is an arm of the Commonwealth of Pennsylvania ("Commonwealth" or "State") and entitled to immunity under the Eleventh Amendment. [Dkt. 12] The Court addressed this question by applying the Fourth Circuit's nonexclusive four-factor test. (Mem. Op. [Dkt. 18] at 8–21 (citing *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255 (4th Cir.2005); *see also U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131 (4th Cir. 2014) ("*Oberg II* ").) This Court concluded that PHEAA did not meet its burden of showing an entitlement to Eleventh Amendment immunity "at this stage," (Mem. Op. at 21.), and denied the motion to dismiss, (Order Denying Mot. to Dismiss [Dkt. 19] ).

On August 21, 2014, PHEAA filed its Motion for Summary Judgment [Dkt. 57] and accompanying brief in support [Dkt. 58]. Before filing an opposition brief, Pele filed his own cross-motion for Partial Summary Judgment [Dkt. 68] on PHEAA's sovereign immunity affirmative defense, and on five other affirmative defenses asserted by PHEAA, with an accompanying brief in support [Dkt. 69] on September 4, 2014. Both parties timely filed opposition [Dkts. 77, 86] and reply briefs [Dkt. 84, 89]. The Court entertained oral argument on September 25, 2014. Having been fully briefed and argued, the motions are now before the Court.

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Evans v. Techs. Applications & Serv., Co.*, 80 F.3d 954, 958–59 (4th Cir.1996) (citations omitted). When moving for summary judgment on an affirmative defense, such as sovereign immunity under the Eleventh Amendment, the defendant "must conclusively establish all essential elements of that defense." *Ray Commc'ns, Inc. v. Clear Channel*

Commc'ns, Inc., 673 F.3d 294, 299 (4th Cir.2012) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the affirmative defense is supported by sufficient evidence, the burden then shifts to the plaintiff, who must "come forward with specific facts showing that there is a genuine issue for trial." Ray Commc'ns, Inc., 673 F.3d at 299 (citations and quotation marks omitted).

The absence or presence of a genuine dispute as to any material fact must be supported either by "citing to particular parts of materials in the record ... or showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed.R.Civ.P. 56(c)(1)(A)-(B). While the Court "must draw any inferences in the light most favorable to the non-movant," Brock v. Entre Computer Ctrs., 933 F.2d 1253, 1259 (4th Cir.1991) (citations omitted), the non-movant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir.1985); see also Anderson, 477 U.S. at 248–52, 106 S.Ct. 2505 (finding the very existence of a scintilla of evidence or of unsubstantiated conclusory allegations insufficient to avoid summary judgment). Rather, a genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. Id.

Specifically in this Court, on summary judgment, the parties are required to list the undisputed material facts. E.D. Va. Local Civil Rule 56(B). "In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Id.

Similarly, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion." Fed.R.Civ.P. 56(e)(2). Where there is conflicting evidence, the court must credit the evidence of both sides and acknowledge that there is a genuine issue of material fact that cannot be resolved by summary judgment. See Tolan v. Cotton, —— U.S. ——, 134 S.Ct. 1861, 1868–69, 188 L.Ed.2d 895 (2014) ("By weighing the evidence and reaching factual inferences contrary to [the non-movant's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party.")

### III. Analysis

PHEAA argues that it is entitled to judgment as a matter of law because Pele's claims are barred by Eleventh Amendment immunity. The analysis begins just as it did for PHEAA's motion to dismiss. The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Accordingly, a state is only subject to suit in federal court if (1) the state unambiguously consents to that suit or (2) Congress, acting under powers granted to it in section five of the Fourteenth Amendment, has clearly abrogated the state's immunity. See Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 54–55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Relevant to this matter, "it is well settled that this protection extends also to 'state

agents and state instrumentalities' ... or stated otherwise to 'arm[s] of the State.' " *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 222 (4th Cir.2001) (citations omitted).

It is undisputed that PHEAA has not waived sovereign immunity and that Congress has not abrogated the state's immunity. Rather, PHEAA contends that after discovery, the evidence shows that there is no genuine issue as to any material fact, and that PHEAA is entitled to judgment as a matter of law because it is an arm of the state of Pennsylvania and entitled to Eleventh Amendment immunity. In his opposition, Pele relies heavily on this Court's Memorandum Opinion regarding the motion to dismiss and the Fourth Circuit's opinion in *Oberg II*. However, both opinions addressed motions to dismiss. And in *Oberg II*, the Fourth Circuit remanded the case to this Court for limited discovery on the precise issue now before the Court: whether PHEAA is "truly subject to sufficient state control to render [it] a part of the state." 745 F.3d at 141.

Now that discovery has closed in this matter, with a more complete record, the Court again turns to the nonexclusive four-factor test used by the Fourth Circuit to determine whether PHEAA, a governmental entity, is an "arm of the state" under the Eleventh Amendment and entitled to immunity. *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 261 (4th Cir. 2005) (citing *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456 (4th Cir.1987)).

## A. State Treasury

■ When the entity is a defendant, like PHEAA is here, the first arm-of-the-state factor is "whether any judgment against the entity as defendant will be paid by the State." *Oberg II*, 745 F.3d at 136–37 (citations omitted). This includes functional

liability, "even if the state is not legally liable." *Id.* at 137 (quoting *Stoner v. Santa Clara Cnty. Office of Educ.*, 502 F.3d 1116, 1122 (9th Cir.2007); *see also Hess v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 50, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) ("Where an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency.")). While the state treasury factor no longer deserves "dispositive preeminence ... [it still] remains of considerable importance." *Oberg II*, 745 F.3d at 137 n. 4 (citations and quotation marks omitted).

In *Oberg II*, the Fourth Circuit held that "because state law instructs that PHEAA would pay any judgment in this case with its own moneys from its segregated fund ... the first factor weighs heavily against holding that PHEAA is an arm of the state." 745 F.3d at 139 (citing 24 Pa. Stat. § 5104(3)). The Fourth Circuit primarily relied on the statutory directives of 24 Pa. Stat. § 5104(3) ("[N]o obligation of the agency shall be a debt of the State ....."), and 24 Pa. Stat. § 5105.10 (establishing the Educational Loan Assistance Fund ("ELAF")), to conclude that the first factor weighs heavily against sovereign immunity.

In reviewing *de novo* the district court's dismissal under Rule 12(b)(6), however, the record before the court was not fully developed, as it is now.

■ Therefore, even in light of the statutory directive that "no obligation of the agency shall be a debt of the State," the Court finds with the benefit of discovery, that Pennsylvania would be functionally liable for a judgment against PHEAA. *See Oberg II*, 745 F.3d at 137 (citing *Hess,*

513 U.S. at 50, 115 S.Ct. 394). Accordingly, the first factor weighs in favor of holding that PHEAA is an arm of the state.

In the record now before the Court, it is undisputed that a judgment against PHEAA would be paid with the Commonwealth's money from the Pennsylvania Treasury Department ("State Treasury"). (Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br."), Ex. 1 [Dkt. 58–2] ("Adolph Decl.") ¶ 11 ("A monetary judgment against PHEAA would be paid with the Commonwealth's money."); Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n"), Ex. A [Dkt. 77–1] ("Guenther Depo.") at 70–72 (answering in the affirmative that the judgment in this case will be paid by the State Treasurer out of the PHEAA Discretionary Fund, which is the money that PHEAA initially put into that account).) Pele argued in his opposition to the motion to dismiss that PHEAA would pay a judgment in this case out of a separate operating account and not the State Treasury, (Mem. Op. at 11.), and he persists in this argument in opposition to summary judgment, but without the requisite factual support in the record. (See Pl.'s Opp'n at 15–19.) The undisputed facts in the record, mainly supported by the deposition and declaration of Mr. Timothy Guenther, PHEAA's Chief Financial Officer, establish that any judgment against PHEAA would be paid with state funds from the State Treasury.

First, all of PHEAA's revenues or earnings are deposited into the State Treasury. (Def.'s Br. at 24, Statement of Fact ("Stmt. Fact") ¶ 22 (citing 24 Pa. Stat. § 5104(3); Guenther Dep. at 71).) Pele unsuccessfully attempts to dispute this fact by stating it is "not supported by the record," and by arguing that PHEAA's funds are separately stored in banks and not comingled with tax revenues. (Pl.'s Opp'n at 6 (citing to various portions of Mr. Guenther's deposition).) However, Mr. Guenther's testimony regarding PHEAA's funds and the State Treasury can be summarized as follows: PHEAA maintains seven separate bank accounts, six with M & T Bank and one with Metro Bank.[1] (Guenther Dep. at 41.) The M & T accounts generally assist the State Treasury in "handling items,"[2] while the Metro Bank account contains separate federal funds. (Id.) PHEAA's revenues are eventually routed through the bank accounts to the State Treasury, which then invests the money in various funds, including PHEAA's Discretionary Fund, from which any settlements or judgments would be paid. (Id. at 51–55.)

In fact, Pele admits that all revenues into, or payments out of, PHEAA's separate bank accounts are eventually accounted for by the State Treasury. (Pl.'s Opp'n at 6–7 (admitting Stmt. Fact ¶ 25 while contesting PHEAA's annual financial reports); but see Def.'s Reply at 13 (breaking down annual financial report).) It is undisputed that

---

1. In addition to the operations account, PHEAA maintains an advance account, a "COMPASS" account, a reimbursement account, a loan origination account, and a dormant account, all with specific purposes. (Id. at 43–45.).

2. PHEAA uses the bank accounts to route payments into and out of the State Treasury. For instance, any money that gets deposited into the M & T accounts, like a client paying servicing fees, once cleared, "goes to the State Treasury." (Id. at 42, 43, 45.) Conversely, any money PHEAA needs to pay out, like a vendor's bill, will be paid out through one of the M & T accounts, with the State Treasury later transferring the requisite funds into the account. (Id. at 42 (discussing "backfunding").) Use of M & T accounts are "[p]urely a convenience to the State Treasurer," to facilitate operational transactions. (Id.).

[t]he money that PHEAA receives from borrowers for the loans it services does not go immediately into the Treasury. Instead, the borrowers pay PHEAA, which deposits the funds into bank accounts from which it makes payments to actual lenders. PHEAA then deposits its servicing fees into the Treasury. [And pursuant to federal regulation,] PHEAA manages a reserve fund that belongs to the Federal Government for the defaulted loans that are guaranteed by the Federal Government, but which PHEAA collects. The Government pays PHEAA a fee for its service, and PHEAA deposits the fees into the Commonwealth Treasury.

(Def.'s Br. at 15, Stmt. Fact ¶ 25 (citing Ex. 3 [Dkt. 58-4, corrected at Dkt. 78] ("Guenther Decl.") ¶¶ 28-29; Guenther Dep. at 41-45).)[3] In sum, the undisputed evidence in the record shows that PHEAA utilizes separate bank accounts, just like other State agencies, to facilitate day-to-day operations, but ultimately, the funds are routed into and out of the State Treasury. By failing to cite evidence other than Mr. Guenther's deposition, Pele fails to raise a genuine issue as to this material fact, and therefore it is undisputed. Fed. R.Civ.P. 56(e)(2).

Second, even though a portion of PHEAA funds are earmarked for the ELAF, PHEAA's revenues are comingled within the State Treasury's general fund and the State Treasurer invests this money as part of the State's funds. (Def.'s Br.

at 14, Stmt. Fact ¶ 22 (citing Ex. 4 [Dkt. 58-5] ("Craig Decl.") ¶ 5; Guenther Decl. ¶ 25).) In *Oberg II*, the Fourth Circuit found that "PHEAA's funds are held in a *segregated* account apart from general state funds." 745 F.3d at 138-39 (citing 24 Pa. Stat. § 5105.10 ("There is hereby created a fund within the State Treasury to be known as the Educational Loan Assistance Fund.") (emphasis in original)). The evidence now in the record illustrates with greater detail how the State Treasury holds and invests state funds, including those attributable to PHEAA.

> [M]onies that PHEAA receives through lending, loan servicing, loan guaranteeing and debt issuances are deposited into the Treasury of the Commonwealth, designated as Commonwealth Fund 79— the Education Loan Assistance Fund ("ELAF"). Like other state agencies, PHEAA's funds are pooled for investment purposes with other funds, including the Commonwealth's General Fund. The Treasurer invests PHEAA's funds in short-term, liquid assets (Investment Pool 99) and long term investments (Investment Pool 198).

(Craig Decl. ¶ 5.) In other words, even though ELAF money is "segregated 'on paper' as earmarked funds ... [t]he money itself is mingled with the Commonwealth's general funds; the Treasurer includes the funds in the money he or she invests on behalf of the Commonwealth." (Guenther Decl. ¶ 25.) The undisputed[4]

---

**3.** *Compare* Stmt. Fact ¶ 27 (discussing PHEAA's requisition process with the State Treasury) *and* Stmt. Fact ¶ 28 (discussing the State Treasury "backfunding" process), *with* Pl.'s Opp'n at 7 ("[As to Stmt. Fact ¶ 27 a]dmit that the witness did say that is the way that funds held within the state treasury need to be handled.... [As to Stmt. Fact ¶ 28 d]enied as phrased. Mr. Guenther will use the operating account to pay a PHEAA Invoice: 'To assist the State Treasury in handling a

payment quicker than the State Treasury was prepared to handle it.'"). Pele fails to raise a genuine dispute regarding the processing of PHEAA revenues and payments into and out of the State Treasury.

**4.** Pele does not dispute this fact, but questions the amount of money held in ELAF, as compared to PHEAA's Annual Financial Report. (*See* Pl.'s Opp'n at 6.) Pele does not cite to another portion of the record to raise a genu-

evidence before the Court shows that while PHEAA revenues are earmarked for the ELAF fund, the money itself is still comingled and invested along with other general state funds in the State Treasury. *Cf. Oberg II,* 745 F.3d at 139 (quoting *Blake v. Kline,* 612 F.2d 718, 723 (3d Cir.1979) (remanding for further consideration because the entity's fund was "set apart in the state treasury from general state funds and ... administered by the State Treasurer at the discretion of the Board.")).

Moreover, while PHEAA's revenues "shall be deposited in the State Treasury and may be utilized at the discretion of the board of directors for carrying out any of the corporate purposes of the agency," 24 Pa. Stat. § 5104(3), PHEAA must first receive approval from the State Treasurer before PHEAA can spend money, just like every other state agency. (Def.'s Br. at 15, Stmt. Fact ¶ 26 (citing Craig Decl. ¶ 6 ("The Treasurer treats PHEAA like any other Commonwealth agency. Specifically, before PHEAA can spend any of the money that is deposited into the Treasury, it must first receive approval from the Treasurer or his/her staff."); Guenther Dep. at 68, 71 ("I believe all of our revenues must be deposited to State Treasury. The State Treasurer decides what gets disbursed. If PHEAA is dissolved, the money goes to the Commonwealth of Pennsylvania. These are Commonwealth assets.")); *see also* Guenther Decl. Ex. B. [Dkt. 78] at 36 (Fiscal Examiner from State Treasury asking PHEAA for itemized receipt from restaurant to ensure alcohol was not ordered, and to prevent improper use of state funds).) Pele denies this material fact, but in support, baldly asserts that "PHEAA does not need approval to spend the money that is not in the state treasury," and cites only to the

same lines of Mr. Guenther's deposition. (Pl.'s Opp'n at 7 ("The corporate representative on this topic and the CFO can only say that he 'believes' the money has to be deposited into the state treasury.").) But Pele does not offer any evidence to contradict, or genuinely dispute, the evidence in the record. Thus, it is also undisputed that PHEAA must first receive approval from the State Treasurer before PHEAA can spend money, just like any other state agency in Pennsylvania. Fed.R.Civ.P. 56(e)(2) ("If a party fails ... to properly address another party's assertion of fact as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion.").

Third, upon PHEAA's dissolution, "all the property and moneys ... shall become the property of the Commonwealth." (Def.'s Br. at 15, Stmt. Fact ¶ 24 (citing 24 Pa. Stat. § 5109; Guenther Dep. at 71 ("If PHEAA is dissolved, the money goes to the Commonwealth of Pennsylvania. These are Commonwealth assets.")).) Pele does not contest this material fact and therefore it is undisputed. (Pl.'s Opp'n at 6.).

Lastly, the Court finds that any judgment against PHEAA "would directly interfere with the state's fiscal autonomy." *Md. Stadium Auth.,* 407 F.3d at 264 (citation omitted). Pennsylvania State Representative William Adolph, Jr., the Chairman of PHEAA's Board of Directors and the Chairman of the House of Representatives Appropriations Committee, succinctly stated the effect of a monetary judgment against PHEAA, and the choice the Pennsylvania state government would then face. A monetary judgment against PHEAA would be paid with the Commonwealth[']s money. It would also impact

___

ine issue as to whether PHEAA's revenues are comingled and invested within the Treasury's

general fund; thus it is undisputed. Fed. R.Civ.P. 56(e)(2).

the amount of money that PHEAA would be paid with the Commonwealth's grant programs and its ability to administer those programs, as well as impact the amount of revenue it uses for all the other public service programs it offers. Specifically, if a significant judgment were entered against PHEAA, the General Assembly would have no choice but to appropriate money (as it has done in the past) to PHEAA to allow for its continued operation or substantially reduce or do away with its grant programs.

(Def.'s Br. Ex. 1 [Dkt. 58–2] ("Adolph Decl.") ¶ 11.); *cf. S. Carolina Dep't of Disabilities & Special Needs v. Hoover Universal, Inc.*, 535 F.3d 300, 306 (4th Cir. 2008) (holding district courts must focus on the "broader inquiry [of] ... whether recovery here would inure *to the benefit* of the State," and not celebrate form over substance by looking at whether those funds are segregated from the general treasury) (emphasis in original). In light of the undisputed facts regarding PHEAA's revenues and funds as discussed above, the Court finds that the State would be functionally liable for a judgment against PHEAA. *Oberg II*, 745 F.3d at 136–37 (citations omitted). Therefore, because this factor still "remains of considerable importance," *id.* at 137 n. 4, the Court finds that the first arm-of-the-state factor weighs in PHEAA's favor.

### B. Degree of Autonomy

■ Second, the Court considers "the degree of autonomy exercised by the entity, including such circumstances as who appoints the entity's directors or officers, who funds the entity, and whether the State retains a veto over the entity's actions." *Id.* at 137 (quoting *U.S. ex rel.*

*Oberg v. Ky. Higher Educ. Student Loan Corp.*, 681 F.3d 575, 580 (4th Cir.2012) ("*Oberg I*") (additional citation omitted)). Also relevant to this factor "is the determination whether an entity has the ability to contract, sue and be sued, and purchase and sell property ... and whether it is represented in legal matters by the state attorney general." *Oberg II*, 745 F.3d at 137 (citations omitted).

■ Several undisputed facts suggest that PHEAA maintains autonomy from the State. Most notably, it is undisputed that PHEAA has been financially independent from the State since 1988. The Pennsylvania General Assembly has not appropriated any tax dollars for PHEAA's operating expenses, and thus PHEAA is entirely self-sufficient. (Def.'s Br. at 14, Stmt. Fact ¶ 19 (citing Guenther Decl. ¶ 22; Adolph Decl. ¶ 10); *see also* Pl.'s Opp'n at 5, 19.) This "strongly suggest[s] that PHEAA is not an arm of the state." *Oberg II*, 745 F.3d at 139. Moreover, it is undisputed that PHEAA has the power to sue, 24 Pa. Stat. § 5104.3, which it has done in this Court to collect amounts owed, (Pl.'s Opp'n Ex. F. [Dkt. 77–6].), the power to purchase and sell property, 24 Pa. Stat. § 5104(3), and the power to enter into contracts, 24 Pa. Stat. § 5104(4). (Def.'s Br. at 10–11, Stmt. Fact ¶¶ 5–6; Pl.'s Opp'n at 3.) All of this suggests operational autonomy, *see Oberg II*, 745 F.3d at 139 (citations omitted), even though the powers are statutory. And while the Pennsylvania Attorney General can represent PHEAA as an agency of the Commonwealth, the Attorney General is also authorized to hire outside counsel for litigation, as was done for this litigation. (Def.'s Br. at 18, Stmt. Fact ¶ 35 (citing Ex. 6 [Dkt. 58–7] ("Forney Decl.") ¶¶ 5–8).[5] This also suggests

---

5. Pele "[n]either [a]dmits nor den[ies]" this assertion of fact, without citing to another

portion of the record. (Pl.'s Opp'n at 8.) Because this assertion of fact is not properly

operational autonomy. *Md. Stadium Auth.*, 407 F.3d at 264–65 (citing *Cash v. Granville Cnty. Bd. of Educ.*, 242 F.3d 219, 225 (4th Cir.2001)) (noting lack of control indicated by the fact that local school board was represented by private counsel instead of the Attorney General)) (additional citation omitted).

Conversely, there also are indicia of State control over PHEAA. First, the Pennsylvania General Assembly confers certain powers on PHEAA, as discussed above. (Def.'s Br. at 10, Stmt. Fact ¶ 5; Pl.'s Opp'n at 3.) This weighs against autonomy and in favor of immunity. *See College Sav. Bank v. Florida Prepaid Postsecondary Education Expense Bd.*, 948 F.Supp. 400, 412 (D.N.J.1996) (finding the second factor weighed in favor of immunity in part because the agency had "only those powers specifically granted to them by the legislature."). Second, it is undisputed[6] that PHEAA's Board of Directors consists of sixteen state legislators, three gubernatorial appointees, and the Secretary of Education, who is also appointed by the Governor. All gubernatorial appointees are confirmed by the State Senate. (Def.'s Br. at 11, Stmt. Fact ¶ 8 (citing Adolph Decl. ¶ 12).) This also "indicates state control." *Oberg II*, 745 F.3d at 139 (citing *Md. Stadium Auth.*, 407 F.3d at 264).[7] Moreover, because PHEAA is an agency of the Commonwealth, the General Assembly imposed significant limitations on PHEAA's autonomy. Specifically, it is undisputed that the Department

of the Auditor General may conduct audits of PHEAA activities, (Def.'s Br. at 18, Stmt. Fact ¶ 38 (citing 24 Pa. Stat. §§ 5104(1.1), 5108); Pl.'s Opp'n at 8.), the Governor must approve PHEAA debts, or the issuance of notes and bonds, (Def.'s Br. at 14, Stmt. Fact ¶ 20 (citing 24 Pa. Stat. §§ 5104(3), 5105.1(a)); Pl.'s Opp'n at 5.), and PHEAA must report on its condition to the legislature and the Governor at the end of each fiscal year. (Def.'s Br. at 18, Stmt. Fact ¶ 37 (citing 24 Pa. Stat. § 5108); Pl.'s Opp'n at 8.) "These factors may mean, as PHEAA contends, that it is simply a tool of the state." *Oberg II*, 745 F.3d at 139.

In all, the Court finds that PHEAA does have some intimate connections to the Commonwealth of Pennsylvania and the state government. Ultimately, however, this factor weighs against holding that PHEAA is an arm of the state due to its high degree of operational autonomy and independence. *See id.* ("Although the facts relevant to this second factor cut both ways, when we consider 'all reasonable inferences in favor of plaintiff' as we must at this stage ... [on a Rule 12(b)(6) motion], we conclude that this factor also counsels against holding that PHEAA is an arm of the state.") (citation omitted); *see also Brock*, 933 F.2d at 1259 ("[On] summary judgment, we must draw any inferences in the light most favorable to the non-movant.") (citations omitted). Therefore, the second factor suggests

disputed with factual support from the record, it is undisputed. Fed.R.Civ.P. 56(e)(2).

**6.** Pele disputes this fact, arguing that two of the current board members are not "state-level officials." (Pl.'s Opp'n at 4.) But that is not responsive to the material fact asserted. While the two individuals cited by Pele are not "elected" state-level officials, by statute

they were appointed by the Governor and confirmed by the State Senate.

**7.** In 2010, however, the law was changed so that eventually four private citizens will assume board positions vacated by state legislators. (Def.'s Br. at 12, Stmt. Fact ¶ 9; Pl.'s Opp'n at 4.) No legislative Board member has stepped down yet, however, and there are still sixteen legislators on the Board.

PHEAA is not an arm of the state and counsels against immunity.

### C. Local Versus Statewide Concerns

 Third, the Court examines "whether the entity is involved with state concerns as distinct from non-state concerns, including local concerns." *Oberg II*, 745 F.3d at 137 (quoting *Oberg I*, 681 F.3d at 580). "Non-state concerns, however, do not mean *only* local concerns, but rather also encompass other non-state interests like out-of-state operations." *Id.* (internal quotation marks omitted) (emphasis in original). Here, the ultimate issue appears to be a conflict between PHEAA's original statutory purpose and the expansion of PHEAA's nationwide operation in recent years. The parties agree that PHEAA was originally created "for the benefit of the people of the Commonwealth, for the improvement of their health and welfare, and for the promotion of the economy," 24 Pa. Stat. § 5105.6, specifically to perform the government function of improving the higher educational opportunities for Pennsylvania residents, by assisting them with the expenses of higher education, and by enabling lenders and post-secondary institutions to do the same. (Def.'s Br. at 9–10, Stmt. Fact ¶ 1 (citing 24 Pa. Stat. §§ 5102, 5105.6); Pl.'s Opp'n at 1.) Pele does not dispute the original purpose of PHEAA, but instead argues that it has "expanded well beyond those purposes and headed in a different direction as a national student loan servicer." (Pl.'s Opp'n at 1 (citing Guenther Dep. at 15–16 (stating that PHEAA stopped making direct loans to students in March of 2008 because of the financial crisis)).)

The Fourth Circuit found this factor weighed in favor of arm-of-the-state status for PHEAA for two reasons. First, PHEAA was created to financially assist Pennsylvanians' access to higher education, "an area of quintessential state concern," *Oberg II*, 745 F.3d at 140 (citing *Md. Stadium Auth.*, 407 F.3d at 265). Second, the level of PHEAA's out-of-state earnings in 2005 did not equate to a primary out-of-state-focus. *Id.* In examining the three agencies at issue in *Oberg II*, the Fourth Circuit emphasized that the focus of the third factor is whether the agency is *primarily* involved with in-state concerns. *Oberg II*, 745 F.3d at 140 ("[I]t does not seem plausible that by 2006 ... PHEAA's operations focused *primarily* out of state."); *id.* at 142 ("But these assertions do not equate to an allegation that [the defendant's] operations centered *primarily* outside [the state] at any point in time."); *id.* at 145 ("The operative question, however, is whether [the defendant] is *primarily* involved with state concerns.") (emphasis in original and additional citations omitted). In the record now before the Court, even if PHEAA is a national loan servicer, and even if PHEAA "only gave back one-third of the profits to the students of Pennsylvania and retained the rest for PHEAA reserves," (Pl.'s Opp'n at 3.), it is undisputed that PHEAA "lends, purchases, services and guarantees loans for the sole purpose of funding its operations and contributions to state grant programs. In other words, PHEAA generates earnings to return to Pennsylvania students." (Def.'s Br. at 11, Stmt. Fact ¶ 7; Pl.'s Opp'n at 3.) Accordingly, this primary focus on in-state concerns suggests PHEAA is an arm of the state.

Pele "denied" this assertion of fact without support in the record, as required by Rule 56(c). (*See* Pl.'s Opp'n at 3 ("Denied. Mr. Guenther did say that it was a 'major focus of PHEAA,' but the fact that it only gave back one-third of the profits to the students of Pennsylvania and retained the rest for PHEAA reserves, proves which one is more important to PHEAA.").)

This unsupported argument does not establish a genuine issue as to this material fact. In short, while it is undisputed that PHEAA services loans at the national level, including guaranteeing loans in the states of Delaware, Pennsylvania, Virginia, West Virginia, and Georgia, it is also undisputed that PHEAA ultimately earns revenues from its national activities and brings those revenues into the Commonwealth of Pennsylvania and its Treasury for the primary purpose of "funding its operations and contributions to state grant programs." (Def.'s Br. at 11, Stmt. Fact ¶ 7; Pl.'s Opp'n at 3.) The Fourth Circuit made clear in *Oberg II* that even if PHEAA's reach is nationwide, the "operative question" under the third factor is whether PHEAA is primarily involved with state concerns. *Oberg II*, 745 F.3d at 140. The Court must answer this question in the affirmative based on the evidence in the record.

It is undisputed that PHEAA has been servicing loans for students outside Pennsylvania since 1974, so this aspect of PHEAA's operation is not new. (Def.'s Br. at 11, Stmt. Fact ¶ 6; Pl.'s Opp'n at 3.) Indeed, PHEAA is authorized by state statute to enter into contracts with "schools, lenders, individuals, corporations ... other states and the Federal government to make, service, invest in, purchase, make commitments to purchase, take assignments of or administer loans." (*Id.* (citing 24 Pa. Stat. § 5104(1.1)(iii)).) But most notably, PHEAA generates revenues from all of its operations "to return to Pennsylvania's students." (Def.'s Br. at 11, Stmt. Fact ¶ 6 (citing Guenther Decl. ¶ 13); Pl.'s Opp'n at 3 ("Admit that PHEAA can enter into contracts and guarantee loans. However, it has taken that

authority to new heights in the past few years when it began guaranteeing loans for other states ... that have nothing to do with its core mission to help Pennsylvania students.").)

Pele attempts to dispute this material fact by arguing that PHEAA does not contribute enough of its revenues to Pennsylvania students. (Pl.'s Opp'n at 24 ("PHEAA only contributes $75 million to the state grant program a year, which means that only a small fraction of that income ever went to the object of PHEAA's alleged mission: the students.").) But the outcome of the Court's analysis under the third factor is not solely dependent on or limited to how the state agency budgets its revenues. Rather, the Court must look to the broader picture of the agency's primary concern. As this Court noted on the motion to dismiss, the Fourth Circuit "gave significant consideration to where a state agency's operations 'centered,' *Oberg II*, [745 F.3d at 142]; the [Fourth Circuit] did not suggest that the use of funds for in-state residents is entirely determinative." (Mem. Op. at 19.) It is undisputed that "[a]ll of PHEAA's lending, guaranteeing and servicing activities are performed by employees who work in Pennsylvania." (Def.'s Br. at 19, Stmt. Fact ¶ 43; Pl.'s Opp'n at 9.)[8] Any nationwide expansion of PHEAA's operation did not alter its primary purpose under the enabling statute to "benefit ... the people of the Commonwealth, for the improvement of their health and welfare, and for the promotion of the economy." 24 Pa. Stat. § 5105.6. And PHEAA generates revenues that, at least in part, go directly to improving the higher educational opportunities for Pennsylvanian residents, "an area of quintessential state concern." *Md.*

---

8. PHEAA employs one individual in the Washington, DC area, but that employee "does not perform lending, servicing and

guaranteeing work"—PHEAA's primary concern. (Def.'s Reply at 23.).

*Stadium Auth.*, 407 F.3d at 265 (citations omitted). Stated differently, PHEAA's expansive out-of-state business ultimately benefits Pennsylvania and its citizens.[9] Therefore, the Court finds that the third factor suggests PHEAA is an arm of the state because PHEAA is primarily involved with in-state concerns.

### D. State Law

■■■■ Fourth, the Court considers "how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm of the State." *Oberg II*, 745 F.3d at 138 (quoting *Oberg I*, 681 F.3d at 580). "Although the question of whether an entity is an alter ego of the state is a question of federal, not state, law, the manner in which state law addresses the entity remains important, and potentially controlling." *Md. Stadium Auth.*, 407 F.3d at 264 (stating the court may consider "the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question.") (citations omitted). The treatment of PHEAA under relevant state law and the undisputed evidence in the record clearly supports a finding as a matter of law that PHEAA is an arm of the state.

The Fourth Circuit held in *Oberg II* that state law "supports PHEAA's contention that it is an arm of Pennsylvania." 745 F.3d at 140. Specifically, the enabling statute states that PHEAA was created "for the benefit of the people ... and the agency [performs] an essential governmental function." 24 Pa. Stat. § 5105.6. "PHEAA's enabling legislation was made effective by 'amendment to the Constitution of Pennsylvania authorizing grants or

loans for higher education,' [24 Pa. Stat.] § 5112, and Pennsylvania state courts have concluded that PHEAA is a state agency for jurisdictional purposes." *Oberg II*, 745 F.3d at 140 (citing *Richmond v. Penn. Higher Educ. Assistance Agency*, 6 Pa. Cmwlth. 612, 297 A.2d 544, 546 (1972); *Penn. Higher Educ. Assistance Agency v. Barksdale*, 303 Pa.Super. 281, 449 A.2d 688, 689–90 (1982)). Pele's attempt to create a genuine issue of material fact under this fourth factor is unavailing. The Pennsylvania Commonwealth Attorneys Act explicitly defines PHEAA as an "independent agency." 71 Pa. Stat. § 732–102. But this only serves to distinguish PHEAA from executive agencies. This does nothing to dispute the fact that PHEAA, an independent agency as defined by state law, is an arm of the Pennsylvania state government.

Similarly, Pele does not dispute other material facts that show PHEAA's relationship to Pennsylvania under state law is sufficiently close to make it an arm of the state. The following facts in the record before the Court are undisputed. PHEAA's property, income, and activities are exempt from taxation, as is the income from the bonds and notes that PHEAA issues. (Def.'s Br. at 14, Stmt. Fact ¶ 21 (citing 24 Pa. Stat. §§ 5105.6, 5107); Pl.'s Opp'n at 5 ("Admit.").) PHEAA's officers and management employees are "public officials" subject to the Pennsylvania Public Official and Employee Ethics Act, which applies to "any agency performing a governmental function." (Def.'s Br. at 19, Stmt. Fact ¶ 42 (citing 65 Pa.C.S.A. § 1102); Pl.'s Opp'n at 8 ("Neither [a]dmit nor deny.").) Furthermore, several incidents of working at PHEAA suggest state control: PHEAA's employees are paid

---

9. Moreover, if PHEAA were dissolved today, all of its funds and property would revert to the Commonwealth of Pennsylvania. (Def.'s Br. at 15, Stmt. Fact ¶ 24 (citing 24 Pa. Stat. § 5109); Pl.'s Opp'n at 6 ("Admit.").)

from the Commonwealth Treasury; all employees must participate in the State Employee Retirement System; all employees must be covered by the Pennsylvania Employees Benefit Trust for healthcare; and PHEAA's employee badges state, "Commonwealth of Pennsylvania State Employee." (Def.'s Br. at 18, Stmt. Facts ¶ 40; Pl's Opp'n at 8 ("PHEAA employees are paid from PHEAA's funds. Mr. Craig in his Declaration simply says that the payments are run through the Treasury each month.").) Accordingly, it is clear under Pennsylvania law and from the undisputed material facts in the record that PHEAA is treated as a state agency. Therefore, the fourth factor also weighs in favor of finding PHEAA is an arm of the state and entitled to immunity.

## IV. Conclusion

With the benefit of a more complete record after discovery, factors one, three, and four support a finding that PHEAA is an arm of Pennsylvania's state government entitled to Eleventh Amendment immunity. Only the second factor suggests otherwise, and even then, this factor is not overwhelming. Weighing all four factors, the Court finds that PHEAA has met its burden as a matter of law to establish that it is "truly subject to sufficient state control to render [it] a part of the state." *Oberg II*, 745 F.3d at 136 (quoting *Oberg I*, 681 F.3d at 579.). In response, Pele did not sufficiently raise a genuine issue as to any material fact that demonstrates a need for trial. Therefore, PHEAA is entitled to judgment as a matter of law and immunity under the Eleventh Amendment.

For the foregoing reasons, the Court will grant PHEAA's motion for summary judgment and deny Pele's cross-motion for partial summary judgment. An appropriate Order shall issue.

## ORDER

For the reasons states in the accompanying Memorandum Opinion, it is hereby ORDERED that:

(1) Defendant Pennsylvania Higher Education Assistance Agency's Motion for Summary Judgement [Dkt. 57] is GRANTED;

(2) Plaintiff Lee Pele's Motion for Partial Summary Judgment [Dkt. 68] is DENIED;

(3) Judgment is ENTERED in favor of Defendant Pennsylvania Higher Education Assistance Agency; and

(4) The Clerk of the Court shall forward copies of this Order and accompanying Memorandum Opinion to all counsel of record. THIS ORDER IS FINAL.